# CLINTON, PRESIDENT OF THE UNITED STATES, ET AL. *v.* CITY OF NEW YORK ET AL.

No. 97–1374.   Argued April 27, 1998—Decided June 25, 1998

418

STEVENS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and KENNEDY, SOUTER, THOMAS, and GINSBURG, JJ., joined. KENNEDY, J., filed a concurring opinion, *post*, p. 449. SCALIA, J., filed an opinion concurring in part and dissenting in part, in which O'CONNOR, J., joined, and in which BREYER, J., joined as to Part III, *post*, p. 453. BREYER, J., filed a dissenting opinion, in which O'CONNOR and SCALIA, JJ., joined as to Part III, *post*, p. 469.

*Solicitor General Waxman* argued the cause for the appellants. With him on the briefs were *Assistant Attorney General Hunger, Deputy Solicitor General Kneedler, Malcolm L. Stewart,* and *Douglas N. Letter.*

*Louis R. Cohen* argued the cause for appellees Snake River Potato Growers, Inc., et al. With him on the brief were *Lloyd N. Cutler, Lawrence A. Kasten, Donald B. Holbrook, Randon W. Wilson,* and *William H. Orton. Charles J. Cooper* argued the cause for appellees City of New York et al. With him on the briefs were *M. Sean Laane, Leonard J. Koerner, Alan G. Krams, David B. Goldin,* and *Peter F. Nadel.**

JUSTICE STEVENS delivered the opinion of the Court.

The Line Item Veto Act (Act), 110 Stat. 1200, 2 U. S. C. § 691 *et seq.* (1994 ed., Supp. II), was enacted in April 1996

---

*Briefs of *amici curiae* urging reversal were filed for the United States Senate by *Thomas B. Griffith, Morgan J. Frankel,* and *Steven F. Huefner;* for *Marci Hamilton, pro se,* and *David Schoenbrod, pro se;* for Congressman Dan Burton et al. by *James M. Spears;* and for *John S. Baker, Jr., pro se.*

Briefs of *amici curiae* urging affirmance were filed for the Bar of the City of New York by *Louis A. Craco, Jr., James F. Parver,* and *David P. Felsher;* for Senator Robert C. Byrd et al. by *Michael Davidson* and *Mark A. Patterson;* and for Representative Henry W. Waxman et al. by *Alan B. Morrison.*

and became effective on January 1, 1997. The following day, six Members of Congress who had voted against the Act brought suit in the District Court for the District of Columbia challenging its constitutionality. On April 10, 1997, the District Court entered an order holding that the Act is unconstitutional. *Byrd* v. *Raines*, 956 F. Supp. 25. In obedience to the statutory direction to allow a direct, expedited appeal to this Court, see §§ 692(b)–(c), we promptly noted probable jurisdiction and expedited review, 520 U. S. 1194 (1997). We determined, however, that the Members of Congress did not have standing to sue because they had not "alleged a sufficiently concrete injury to have established Article III standing," *Raines* v. *Byrd*, 521 U. S. 811, 830 (1997); thus, "[i]n . . . light of [the] overriding and time-honored concern about keeping the Judiciary's power within its proper constitutional sphere," *id.*, at 820, we remanded the case to the District Court with instructions to dismiss the complaint for lack of jurisdiction.

Less than two months after our decision in that case, the President exercised his authority to cancel one provision in the Balanced Budget Act of 1997, Pub. L. 105–33, 111 Stat. 251, 515, and two provisions in the Taxpayer Relief Act of 1997, Pub. L. 105–34, 111 Stat. 788, 895–896, 990–993. Appellees, claiming that they had been injured by two of those cancellations, filed these cases in the District Court. That Court again held the statute invalid, 985 F. Supp. 168, 177–182 (1998), and we again expedited our review, 522 U. S. 1144 (1998). We now hold that these appellees have standing to challenge the constitutionality of the Act and, reaching the merits, we agree that the cancellation procedures set forth in the Act violate the Presentment Clause, Art. I, § 7, cl. 2, of the Constitution.

I

We begin by reviewing the canceled items that are at issue in these cases.

*Section 4722(c) of the Balanced Budget Act*

Title XIX of the Social Security Act, 79 Stat. 343, as amended, authorizes the Federal Government to transfer huge sums of money to the States to help finance medical care for the indigent. See 42 U. S. C. § 1396d(b). In 1991, Congress directed that those federal subsidies be reduced by the amount of certain taxes levied by the States on health care providers.[1] In 1994, the Department of Health and Human Services (HHS) notified the State of New York that 15 of its taxes were covered by the 1991 Act, and that as of June 30, 1994, the statute therefore required New York to return $955 million to the United States. The notice advised the State that it could apply for a waiver on certain statutory grounds. New York did request a waiver for those tax programs, as well as for a number of others, but HHS has not formally acted on any of those waiver requests. New York has estimated that the amount at issue for the period from October 1992 through March 1997 is as high as $2.6 billion.

Because HHS had not taken any action on the waiver requests, New York turned to Congress for relief. On August 5, 1997, Congress enacted a law that resolved the issue in New York's favor. Section 4722(c) of the Balanced Budget Act of 1997 identifies the disputed taxes and provides that they "are deemed to be permissible health care related taxes and in compliance with the requirements" of the relevant provisions of the 1991 statute.[2]

---

[1] Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of 1991, Pub. L. 102–234, 105 Stat. 1793, 42 U. S. C. § 1396b(w).

[2] Section 4722(c) provides:

"(c) WAIVER OF CERTAIN PROVIDER TAX PROVISIONS.—Notwithstanding any other provision of law, taxes, fees, or assessments, as defined in section 1903(w)(3)(A) of the Social Security Act (42 U. S. C. 1396b(w)(3)(A)), that were collected by the State of New York from a health care provider before June 1, 1997, and for which a waiver of the provisions of subparagraph (B) or (C) of section 1903(w)(3) of such Act has been applied for, or that would, but for this subsection require that such

On August 11, 1997, the President sent identical notices to the Senate and to the House of Representatives canceling "one item of new direct spending," specifying § 4722(c) as that item, and stating that he had determined that "this cancellation will reduce the Federal budget deficit." He explained that § 4722(c) would have permitted New York "to continue relying upon impermissible provider taxes to finance its Medicaid program" and that "[t]his preferential treatment would have increased Medicaid costs, would have treated New York differently from all other States, and would have established a costly precedent for other States to request comparable treatment."[3]

*Section 968 of the Taxpayer Relief Act of 1997*

A person who realizes a profit from the sale of securities is generally subject to a capital gains tax. Under existing law, however, an ordinary business corporation can acquire a corporation, including a food processing or refining company, in a merger or stock-for-stock transaction in which no gain is recognized to the seller, see 26 U. S. C. §§ 354(a), 368(a); the seller's tax payment, therefore, is deferred. If, however, the purchaser is a farmers' cooperative, the parties cannot structure such a transaction because the stock of the cooperative may be held only by its members, see § 521(b)(2); thus, a seller dealing with a farmers' cooperative cannot obtain the benefits of tax deferral.

---

a waiver be applied for, in accordance with subparagraph (E) of such section, and, (if so applied for) upon which action by the Secretary of Health and Human Services (including any judicial review of any such proceeding) has not been completed as of July 23, 1997, are deemed to be permissible health care related taxes and in compliance with the requirements of subparagraphs (B) and (C) of section 1903(w)(3) of such Act." 111 Stat. 515.

[3] App. to Juris. Statement 63a–64a (Cancellation No. 97–3). The quoted text is an excerpt from the statement of reasons for the cancellation, which is required by the Line Item Veto Act. See 2 U. S. C. § 691a (1994 ed., Supp. II).

424

In § 968 of the Taxpayer Relief Act of 1997, Congress amended § 1042 of the Internal Revenue Code to permit owners of certain food refiners and processors to defer the recognition of gain if they sell their stock to eligible farmers' cooperatives.[4] The purpose of the amendment, as repeatedly explained by its sponsors, was "to facilitate the transfer of refiners and processors to farmers' cooperatives."[5] The

[4] Section 968(a) of the Taxpayer Relief Act of 1997 amended 26 U. S. C. § 1042 by adding a new subsection (g), which defined the sellers eligible for the exemption as follows:

"(2) QUALIFIED REFINER OR PROCESSOR.—For purposes of this subsection, the term 'qualified refiner or processor' means a domestic corporation—

"(A) substantially all of the activities of which consist of the active conduct of the trade or business of refining or processing agricultural or horticultural products, and

"(B) which, during the 1-year period ending on the date of the sale, purchases more than one-half of such products to be refined or processed from—

"(i) farmers who make up the eligible farmers' cooperative which is purchasing stock in the corporation in a transaction to which this subsection is to apply, or

"(ii) such cooperative." 111 Stat. 896.

[5] H. R. Rep. No. 105–148, p. 420 (1997); see also 141 Cong. Rec. S18739 (Dec. 15, 1995) (Senator Hatch, introducing a previous version of the bill, stating that it "would provide farmers who form farmers cooperatives the opportunity for an ownership interest in the processing and marketing of their products"); ibid. (Senator Craig, cosponsor of a previous bill, stating that "[c]urrently, farmers cannot compete with other business entities . . . in buying such [processing] businesses because of the advantages inherent in the tax deferrals available in transactions with these other purchases"; bill "would be helpful to farmers cooperatives"); App. 116–117 (Letter from Congresspersons Roberts and Stenholm (Dec. 1, 1995)) (congressional sponsors stating that a previous version of the bill was intended to "provide American farmers a more firm economic footing and more control over their economic destiny. We believe this proposal will help farmers, through their cooperatives, purchase facilities to refine and process their raw commodities into value-added products. . . . It will encourage farmers to help themselves in a more market-oriented environment by vertically integrating. If this legislation is passed, we are confident that, 10 years from now, we will look on this bill as one of the most beneficial actions Congress took for U. S. farmers").

amendment to § 1042 was one of the 79 "limited tax benefits" authorized by the Taxpayer Relief Act of 1997 and specifically identified in Title XVII of that Act as "subject to [the] line item veto."[6]

On the same date that he canceled the "item of new direct spending" involving New York's health care programs, the President also canceled this limited tax benefit. In his explanation of that action, the President endorsed the objective of encouraging "value-added farming through the purchase by farmers' cooperatives of refiners or processors of agricultural goods,"[7] but concluded that the provision lacked safeguards and also "failed to target its benefits to small-and-medium-size cooperatives."[8]

## II

Appellees filed two separate actions against the President[9] and other federal officials challenging these two cancellations. The plaintiffs in the first case are the City of New York, two hospital associations, one hospital, and two unions representing health care employees. The plaintiffs in the second are a farmers' cooperative consisting of about 30 potato growers in Idaho and an individual farmer who is a member and officer of the cooperative. The District Court consolidated the two cases and determined that at least one

---

[6] § 1701(30), 111 Stat. 1101.

[7] App. to Juris. Statement 71a (Cancellation No. 97–2). On the day the President canceled § 968, he stated: "Because I strongly support family farmers, farm cooperatives, and the acquisition of production facilities by co-ops, this was a very difficult decision for me." App. 125. He added that creating incentives so that farmers' cooperatives can obtain processing facilities is a "very worthy goal." *Id.*, at 130.

[8] App. to Juris. Statement 71a (Cancellation No. 97–2). Section 968 was one of the two limited tax benefits in the Taxpayer Relief Act of 1997 that the President canceled.

[9] In both actions, the plaintiffs sought a declaratory judgment that the Line Item Veto Act is unconstitutional and that the particular cancellation was invalid; neither set of plaintiffs sought injunctive relief against the President.

of the plaintiffs in each had standing under Article III of the Constitution.

Appellee New York City Health and Hospitals Corporation (NYCHHC) is responsible for the operation of public health care facilities throughout the City of New York. If HHS ultimately denies the State's waiver requests, New York law will automatically require [10] NYCHHC to make retroactive tax payments to the State of about $4 million for each of the years at issue. 985 F. Supp., at 172. This contingent liability for NYCHHC, and comparable potential liabilities for the other appellee health care providers, were eliminated by § 4722(c) of the Balanced Budget Act of 1997 and revived by the President's cancellation of that provision. The District Court held that the cancellation of the statutory protection against these liabilities constituted sufficient injury to give these providers Article III standing.

Appellee Snake River Potato Growers, Inc. (Snake River) was formed in May 1997 to assist Idaho potato farmers in marketing their crops and stabilizing prices, in part through a strategy of acquiring potato processing facilities that will allow the members of the cooperative to retain revenues otherwise payable to third-party processors. At that time, Congress was considering the amendment to the capital gains tax that was expressly intended to aid farmers' cooperatives in the purchase of processing facilities, and Snake River had concrete plans to take advantage of the amendment if passed. Indeed, appellee Mike Cranney, acting on behalf of Snake River, was engaged in negotiations with the

[10] See, *e. g.,* N. Y. Pub. Health Law § 2807-c(18)(e) (McKinney Supp. 1997–1998) ("In the event the secretary of the department of health and human services determines that the assessments do not . . . qualify based on any such exclusion, then the exclusion shall be deemed to have been null and void . . . and the commissioner shall collect any retroactive amount due as a result . . . . Interest and penalties shall be measured from the due date of ninety days following notice from the commissioner"); § 2807-d(12) (1993) (same); § 2807-j(11) (Supp. 1997–1998) (same); § 2807-s(8) (same).

owner of an Idaho potato processor that would have qualified for the tax benefit under the pending legislation, but these negotiations terminated when the President canceled § 968. Snake River is currently considering the possible purchase of other processing facilities in Idaho if the President's cancellation is reversed. Based on these facts, the District Court concluded that the Snake River plaintiffs were injured by the President's cancellation of § 968, as they "lost the benefit of being on equal footing with their competitors and will likely have to pay more to purchase processing facilities now that the sellers will not [be] able to take advantage of section 968's tax breaks." *Id.*, at 177.

On the merits, the District Court held that the cancellations did not conform to the constitutionally mandated procedures for the enactment or repeal of laws in two respects. First, the laws that resulted after the cancellations "were different from those consented to by both Houses of Congress." *Id.*, at 178.[11] Moreover, the President violated Article I "when he unilaterally canceled provisions of duly enacted statutes." *Id.*, at 179.[12] As a separate basis for

---

[11] As the District Court explained: "These laws reflected the best judgment of both Houses. The laws that resulted after the President's line item veto were different from those consented to by both Houses of Congress. There is no way of knowing whether these laws, in their truncated form, would have received the requisite support from both the House and the Senate. Because the laws that emerged after the Line Item Veto are not the same laws that proceeded through the legislative process, as required, the resulting laws are not valid." 985 F. Supp., at 178–179.

[12] "Unilateral action by any single participant in the law-making process is precisely what the Bicameralism and Presentment Clauses were designed to prevent. Once a bill becomes law, it can only be repealed or amended through another, independent legislative enactment, which itself must conform with the requirements of Article I. Any rescissions must be agreed upon by a majority of both Houses of Congress. The President cannot single-handedly revise the work of the other two participants in the lawmaking process, as he did here when he vetoed certain provisions of these statutes." *Ibid.*

its decision, the District Court also held that the Act "impermissibly disrupts the balance of powers among the three branches of government." *Ibid.*

## III

As in the prior challenge to the Line Item Veto Act, we initially confront jurisdictional questions. The appellees invoked the jurisdiction of the District Court under the section of the Act entitled "Expedited review." That section, 2 U. S. C. § 692(a)(1) (1994 ed., Supp. II), expressly authorizes "[a]ny Member of Congress or any individual adversely affected" by the Act to bring an action for declaratory judgment or injunctive relief on the ground that any provision of the Act is unconstitutional. Although the Government did not question the applicability of that section in the District Court, it now argues that, with the exception of Mike Cranney, the appellees are not "individuals" within the meaning of § 692(a)(1). Because the argument poses a jurisdictional question (although not one of constitutional magnitude), it is not waived by the failure to raise it in the District Court. The fact that the argument did not previously occur to the able lawyers for the Government does, however, confirm our view that in the context of the entire section Congress undoubtedly intended the word "individual" to be construed as synonymous with the word "person."[18]

The special section authorizing expedited review evidences an unmistakable congressional interest in a prompt and authoritative judicial determination of the constitution-

[18] Although in ordinary usage both "individual" and "person" often refer to an individual human being, see, *e. g.,* Webster's Third New International Dictionary 1152, 1686 (1986) ("individual" defined as a "single human being"; "person" defined as "an individual human being"), "person" often has a broader meaning in the law, see, *e. g.,* 1 U. S. C. § 1 ("person" includes "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals").

ality of the Act. Subsection (a)(2) requires that copies of any complaint filed under subsection (a)(1) "shall be promptly delivered" to both Houses of Congress, and that each House shall have a right to intervene. Subsection (b) authorizes a direct appeal to this Court from any order of the District Court, and requires that the appeal be filed within 10 days. Subsection (c) imposes a duty on both the District Court and this Court "to advance on the docket and to expedite to the greatest possible extent the disposition of any matter brought under subsection (a)." There is no plausible reason why Congress would have intended to provide for such special treatment of actions filed by natural persons and to have precluded entirely jurisdiction over comparable cases brought by corporate persons. Acceptance of the Government's new-found reading of § 692 "would produce an absurd and unjust result which Congress could not have intended." *Griffin* v. *Oceanic Contractors, Inc.*, 458 U. S. 564, 574 (1982).[14]

We are also unpersuaded by the Government's argument that appellees' challenge to the constitutionality of the Act is nonjusticiable. We agree, of course, that Article III of the Constitution confines the jurisdiction of the federal courts to actual "Cases" and "Controversies," and that "the doctrine of standing serves to identify those disputes which are appropriately resolved through the judicial process." *Whit-*

---

[14] JUSTICE SCALIA objects to our conclusion that the Government's reading of the statute would produce an absurd result. *Post*, at 454–455. Nonetheless, he states that "'the case is of such imperative public importance as to justify deviation from normal appellate practice and to require immediate determination in this Court.'" *Post*, at 455 (quoting this Court's Rule 11). Unlike JUSTICE SCALIA, however, we need not rely on our *own* sense of the importance of the issue involved; instead, the structure of § 692 makes it clear that *Congress* believed the issue warranted expedited review and, therefore, that Congress did not intend the result that the word "individual" would dictate in other contexts.

*more* v. *Arkansas*, 495 U. S. 149, 155 (1990).[15]   Our disposition of the first challenge to the constitutionality of this Act demonstrates our recognition of the importance of respecting the constitutional limits on our jurisdiction, even when Congress has manifested an interest in obtaining our views as promptly as possible.   But these cases differ from *Raines*, not only because the President's exercise of his cancellation authority has removed any concern about the ripeness of the dispute, but more importantly because the parties have alleged a "personal stake" in having an actual injury redressed rather than an "institutional injury" that is "abstract and widely dispersed."   521 U. S., at 829.

In both the New York and the Snake River cases, the Government argues that the appellees are not actually injured because the claims are too speculative and, in any event, the claims are advanced by the wrong parties.   We find no merit in the suggestion that New York's injury is merely speculative because HHS has not yet acted on the State's waiver requests.   The State now has a multibillion dollar contingent liability that had been eliminated by § 4722(c) of the Balanced Budget Act of 1997.   The District Court correctly concluded that the State, and the appellees, "suffered an immediate, concrete injury the moment that the President used the Line Item Veto to cancel section 4722(c) and deprived them of the benefits of that law."   985 F. Supp., at 174.   The self-evident significance of the contingent liability is confirmed by the fact that New York lobbied Congress for this relief, that Congress decided that it warranted statutory attention, and that the President selected for cancellation only this one provision in an Act that occupies 536 pages of the Statutes at Large.   His action was comparable to the judgment of an appellate court setting aside a verdict for the defendant and remanding for a new trial of a multibillion

---

[15] To meet the standing requirements of Article III, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."   *Allen* v. *Wright*, 468 U. S. 737, 751 (1984).

dollar damages claim. Even if the outcome of the second trial is speculative, the reversal, like the President's cancellation, causes a significant immediate injury by depriving the defendant of the benefit of a favorable final judgment. The revival of a substantial contingent liability immediately and directly affects the borrowing power, financial strength, and fiscal planning of the potential obligor.[16]

We also reject the Government's argument that New York's claim is advanced by the wrong parties because the claim belongs to the State of New York, and not appellees. Under New York statutes that are already in place, it is clear that both the City of New York[17] and the appellee health care providers[18] will be assessed by the State for substantial portions of any recoupment payments that the State may have to make to the Federal Government. To the extent of such assessments, they have the same potential liability as the State does.[19]

---

[16] Because the cancellation of the legislative equivalent of a favorable final judgment causes immediate injury, the Government's reliance on *Anderson* v. *Green*, 513 U. S. 557 (1995) *(per curiam)*, is misplaced. That case involved a challenge to a California statute that would have imposed limits on welfare payments to new residents during their first year of residence in California. The statute could not become effective without a waiver from HHS. Although such a waiver had been in effect when the action was filed, it had been vacated in a separate proceeding and HHS had not sought review of that judgment. Accordingly, at the time the *Anderson* case reached this Court, the plaintiffs were receiving the same benefits as long-term residents; they had suffered no injury. We held that the case was not ripe because, unless and until HHS issued a new waiver, any future injury was purely conjectural. *Id.*, at 559 ("The parties [*i. e.*, the plaintiffs and California, but not HHS] have no live dispute now, and whether one will arise in the future is conjectural"). Unlike New York in this case, they were not contingently liable for anything.

[17] App. 106–107.

[18] See n. 10, *supra.*

[19] The Government relies on *Warth* v. *Seldin*, 422 U. S. 490 (1975), to support its argument that the State, and not appellees, should be bringing this claim. In *Warth* we held, *inter alia*, that citizens of Rochester did not have standing to challenge the exclusionary zoning practices of another community because their claimed injury of increased taxation turned

The Snake River farmers' cooperative also suffered an immediate injury when the President canceled the limited tax benefit that Congress had enacted to facilitate the acquisition of processing plants. Three critical facts identify the specificity and the importance of that injury. First, Congress enacted § 968 for the specific purpose of providing a benefit to a defined category of potential purchasers of a defined category of assets.[20] The members of that statutorily defined class received the equivalent of a statutory "bargaining chip" to use in carrying out the congressional plan to facilitate their purchase of such assets. Second, the President selected § 968 as one of only two tax benefits in the Taxpayer Relief Act of 1997 that should be canceled. The cancellation rested on his determination that the use of those bargaining chips would have a significant impact on the federal budget deficit. Third, the Snake River cooperative was organized for the very purpose of acquiring processing facilities, it had concrete plans to utilize the benefits of § 968, and it was engaged in ongoing negotiations with the owner of a processing plant who had expressed an interest in structuring a tax-deferred sale when the President canceled § 968. Moreover, it is actively searching for other processing facilities for possible future purchase if the President's cancellation is reversed; and there are ample processing facilities in the State that Snake River may be able to purchase.[21] By depriving them of their statutory bargaining chip, the cancellation inflicted a sufficient likelihood of economic injury to establish standing under our precedents. See, e. g., Investment

on the prospective actions of Rochester officials. Id., at 509. Appellees' injury in this case, however, does not turn on the independent actions of third parties, as existing New York law will automatically require that appellees reimburse the State.

Because both the City of New York and the health care appellees have standing, we need not consider whether the appellee unions also have standing to sue. See, e. g., Bowsher v. Synar, 478 U. S. 714, 721 (1986).

[20] See n. 5, supra.

[21] App. 111–115 (Declaration of Mike Cranney).

*Company Institute* v. *Camp*, 401 U. S. 617, 620 (1971); 3 K. Davis & R. Pierce, Administrative Law Treatise 13–14 (3d ed. 1994) ("The Court routinely recognizes probable economic injury resulting from [governmental actions] that alter competitive conditions as sufficient to satisfy the [Article III 'injury-in-fact' requirement]. . . . It follows logically that any . . . petitioner who is likely to suffer economic injury as a result of [governmental action] that changes market conditions satisfies this part of the standing test").

Appellees' injury in this regard is at least as concrete as the injury suffered by the respondents in *Bryant* v. *Yellen*, 447 U. S. 352 (1980). In that case, we considered whether a rule that generally limited water deliveries from reclamation projects to 160 acres applied to the much larger tracts of the Imperial Irrigation District in southeastern California; application of that limitation would have given large landowners an incentive to sell excess lands at prices below the prevailing market price for irrigated land. The District Court had held that the 160-acre limitation did not apply, and farmers who had hoped to purchase the excess land sought to appeal. We acknowledged that the farmers had not presented "detailed information about [their] financial resources," and noted that "the prospect of windfall profits could attract a large number of potential purchasers" besides the farmers. *Id.*, at 367, n. 17. Nonetheless, "even though they could not with certainty establish that they would be able to purchase excess lands" if the judgment were reversed, *id.*, at 367, we found standing because it was "likely that excess lands would become available at less than market prices," *id.*, at 368. The Snake River appellees have alleged an injury that is as specific and immediate as that in *Yellen*. See also *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.*, 438 U. S. 59, 72–78 (1978).[22]

[22] The Government argues that there can be an Article III injury only if Snake River would have actually obtained a facility on favorable terms. We have held, however, that a denial of a benefit in the bargaining process

As with the New York case, the Government argues that the wrong parties are before the Court—that because the sellers of the processing facilities would have received the tax benefits, only they have standing to challenge the cancellation of § 968. This argument not only ignores the fact that the cooperatives were the intended beneficiaries of § 968, but also overlooks the self-evident proposition that more than one party may have standing to challenge a particular action or inaction.[23] Once it is determined that a particular plain-

---

can itself create an Article III injury, irrespective of the end result. See *Northeastern Fla. Chapter, Associated Gen. Contractors of America* v. *Jacksonville*, 508 U. S. 656, 666 (1993). In that case an association of contractors challenged a city ordinance that accorded preferential treatment to certain minority-owned businesses in the award of city contracts. The Court of Appeals had held that the association lacked standing "because it failed to allege that one or more of its members would have been awarded a contract but for the challenged ordinance." *Id.*, at 664. We rejected the Court of Appeals' position, stating that it "cannot be reconciled with our precedents." *Ibid.* Even though the preference applied to only a small percentage of the city's business, and even though there was no showing that any party would have received a contract absent the ordinance, we held that the prospective bidders had standing; the "injury in fact" was the harm to the contractors in the negotiation process, "not the ultimate inability to obtain the benefit." *Id.*, at 666.

Having found that both the New York and Snake River appellees are actually injured, traceability and redressability are easily satisfied—each injury is traceable to the President's cancellation of § 4722(c) or § 968, and would be redressed by a declaratory judgment that the cancellations are invalid.

[23] *Allen* v. *Wright*, 468 U. S. 737 (1984), and *Simon* v. *Eastern Ky. Welfare Rights Organization*, 426 U. S. 26 (1976), are distinguishable, as each of those cases involved a speculative chain of causation quite different from the situation here. In *Allen*, parents of black public school children alleged that, even though it was the policy of the Internal Revenue Service (IRS) to deny tax-exempt status to racially discriminatory schools, the IRS had "not adopted sufficient standards and procedures" to enforce this policy. 468 U. S., at 739. The parents alleged that the lax enforcement caused white students to attend discriminatory *private* schools and, therefore, interfered with their children's opportunity to attend desegre-

tiff is harmed by the defendant, and that the harm will likely be redressed by a favorable decision, that plaintiff has standing—regardless of whether there are others who would

gated *public* schools. We held that the chain of causation between the challenged action and the alleged injury was too attenuated to confer standing:

"It is, first, uncertain how many racially discriminatory private schools are in fact receiving tax exemptions. Moreover, it is entirely speculative . . . whether withdrawal of a tax exemption from any particular school would lead the school to change its policies. . . . It is just as speculative whether any given parent of a child attending such a private school would decide to transfer the child to public school as a result of any changes in educational or financial policy made by the private school once it was threatened with loss of tax-exempt status. It is also pure speculation whether, in a particular community, a large enough number of the numerous relevant school officials and parents would reach decisions that collectively would have a significant impact on the racial composition of the public schools." *Id.*, at 758 (footnote omitted).

Similarly, in *Simon*, the respondents challenged an IRS Revenue Ruling that granted favorable tax treatment to nonprofit hospitals that offered only emergency-room services to the poor. The respondents argued that the Revenue Ruling "'encouraged' hospitals to deny services to indigents." 426 U. S., at 42. As in *Allen*, we held that the chain of causation was too attenuated:

"It is purely speculative whether the denials of service . . . fairly can be traced to [the IRS's] 'encouragement' or instead result from decisions made by the hospitals without regard to the tax implications.

"It is equally speculative whether the desired exercise of the court's remedial powers in this suit would result in the availability to respondents of such services. So far as the complaint sheds light, it is just as plausible that the hospitals to which respondents may apply for service would elect to forgo favorable tax treatment to avoid the undetermined financial drain of an increase in the level of uncompensated services." 426 U. S., at 42–43.

See also *id.*, at 45 ("Speculative inferences are necessary to connect [respondents'] injury to the challenged actions of petitioners").

The injury in the present case is comparable to the repeal of a law granting a subsidy to sellers of processing plants if, and only if, they sell to farmers' cooperatives. Every farmers' cooperative seeking to buy a processing plant is harmed by that repeal.

also have standing to sue. Thus, we are satisfied that both of these actions are Article III "Cases" that we have a duty to decide.

## IV

The Line Item Veto Act gives the President the power to "cancel in whole" three types of provisions that have been signed into law: "(1) any dollar amount of discretionary budget authority; (2) any item of new direct spending; or (3) any limited tax benefit." 2 U. S. C. § 691(a) (1994 ed., Supp. II). It is undisputed that the New York case involves an "item of new direct spending" and that the Snake River case involves a "limited tax benefit" as those terms are defined in the Act. It is also undisputed that each of those provisions had been signed into law pursuant to Article I, § 7, of the Constitution before it was canceled.

The Act requires the President to adhere to precise procedures whenever he exercises his cancellation authority. In identifying items for cancellation he must consider the legislative history, the purposes, and other relevant information about the items. See 2 U. S. C. § 691(b) (1994 ed., Supp. II). He must determine, with respect to each cancellation, that it will "(i) reduce the Federal budget deficit; (ii) not impair any essential Government functions; and (iii) not harm the national interest." § 691(a)(A). Moreover, he must transmit a special message to Congress notifying it of each cancellation within five calendar days (excluding Sundays) after the enactment of the canceled provision. See § 691(a)(B). It is undisputed that the President meticulously followed these procedures in these cases.

A cancellation takes effect upon receipt by Congress of the special message from the President. See § 691b(a). If, however, a "disapproval bill" pertaining to a special message is enacted into law, the cancellations set forth in that message become "null and void." *Ibid.* The Act sets forth a detailed expedited procedure for the consideration of a "disapproval bill," see § 691d, but no such bill was passed for

either of the cancellations involved in these cases.[24]   A majority vote of both Houses is sufficient to enact a disapproval bill.   The Act does not grant the President the authority to cancel a disapproval bill, see § 691(c), but he does, of course, retain his constitutional authority to veto such a bill.[25]

The effect of a cancellation is plainly stated in § 691e, which defines the principal terms used in the Act.   With respect to both an item of new direct spending and a limited tax benefit, the cancellation prevents the item "from having legal force or effect."   §§ 691e(4)(B)–(C).[26]   Thus, under the

---

[24] Congress failed to act upon proposed legislation to disapprove these cancellations.   See S. 1157, H. R. 2444, S. 1144, and H. R. 2436, 105th Cong., 1st Sess. (1997).   Indeed, despite the fact that the President has canceled at least 82 items since the Act was passed, see Statement of June E. O'Neill, Director, Congressional Budget Office, Line Item Veto Act After One Year, The Process and Its Implementation, before the Subcommittee on Legislative and Budget Process of the House Committee on Rules, 105th Cong., 2d Sess. (Mar. 11–12, 1998), Congress has enacted only one law, over a Presidential veto, disapproving *any* cancellation, see Pub. L. 105–159, 112 Stat. 19 (1998) (disapproving the cancellation of 38 military construction spending items).

[25] See n. 29, *infra.*

[26] The term "cancel," used in connection with any dollar amount of discretionary budget authority, means "to rescind."   2 U. S. C. § 691e(4)(A). The entire definition reads as follows:

"The term 'cancel' or 'cancellation' means—

"(A) with respect to any dollar amount of discretionary budget authority, to rescind;

"(B) with respect to any item of new direct spending—

"(i) that is budget authority provided by law (other than an appropriation law), to prevent such budget authority from having legal force or effect;

"(ii) that is entitlement authority, to prevent the specific legal obligation of the United States from having legal force or effect; or

"(iii) through the food stamp program, to prevent the specific provision of law that results in an increase in budget authority or outlays for that program from having legal force or effect; and

"(C) with respect to a limited tax benefit, to prevent the specific provision of law that provides such benefit from having legal force or effect." 2 U. S. C. § 691e(4) (1994 ed., Supp. II).

plain text of the statute, the two actions of the President that are challenged in these cases prevented one section of the Balanced Budget Act of 1997 and one section of the Taxpayer Relief Act of 1997 "from having legal force or effect." The remaining provisions of those statutes, with the exception of the second canceled item in the latter, continue to have the same force and effect as they had when signed into law.

In both legal and practical effect, the President has amended two Acts of Congress by repealing a portion of each. "[R]epeal of statutes, no less than enactment, must conform with Art. I." *INS* v. *Chadha,* 462 U. S. 919, 954 (1983). There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes. Both Article I and Article II assign responsibilities to the President that directly relate to the lawmaking process, but neither addresses the issue presented by these cases. The President "shall from time to time give to the Congress Information on the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient . . . ." Art. II, § 3. Thus, he may initiate and influence legislative proposals.[27] Moreover, after a bill has passed both Houses of Congress, but "before it become[s] a Law," it must be presented to the President. If he approves it, "he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it." Art. I, § 7, cl. 2.[28] His

---

[27] See 3 J. Story, Commentaries on the Constitution of the United States § 1555, p. 413 (1833) (Art. II, § 3, enables the President "to point out the evil, and to suggest the remedy").

[28] The full text of the relevant paragraph of § 7 provides:

"Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States: If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and pro-

"return" of a bill, which is usually described as a "veto,"[29] is subject to being overridden by a two-thirds vote in each House.

There are important differences between the President's "return" of a bill pursuant to Article I, §7, and the exercise of the President's cancellation authority pursuant to the Line Item Veto Act. The constitutional return takes place *before* the bill becomes law; the statutory cancellation occurs *after* the bill becomes law. The constitutional return is of the entire bill; the statutory cancellation is of only a part. Although the Constitution expressly authorizes the President to play a role in the process of enacting statutes, it is silent on the subject of unilateral Presidential action that either repeals or amends parts of duly enacted statutes.

There are powerful reasons for construing constitutional silence on this profoundly important issue as equivalent to an express prohibition. The procedures governing the enactment of statutes set forth in the text of Article I were the product of the great debates and compromises that produced the Constitution itself. Familiar historical materials provide abundant support for the conclusion that the power to enact statutes may only "be exercised in accord with a single, finely wrought and exhaustively considered,

---

ceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law. But in all such Cases the Votes of both Houses shall be determined by Yeas and Nays, and the Names of the Persons voting for and against the Bill shall be entered on the Journal of each House respectively. If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law."

[29] "In constitutional terms, 'veto' is used to describe the President's power under Art. I, §7, of the Constitution." *INS* v. *Chadha*, 462 U. S. 919, 925, n. 2 (1983) (citing Black's Law Dictionary 1403 (5th ed. 1979)).

procedure." *Chadha*, 462 U. S., at 951. Our first President understood the text of the Presentment Clause as requiring that he either "approve all the parts of a Bill, or reject it in toto."[30] What has emerged in these cases from the President's exercise of his statutory cancellation powers, however, are truncated versions of two bills that passed both Houses of Congress. They are not the product of the "finely wrought" procedure that the Framers designed.

At oral argument, the Government suggested that the cancellations at issue in these cases do not effect a "repeal" of the canceled items because under the special "lockbox" provisions of the Act,[31] a canceled item "retain[s] real, legal

[30] 33 Writings of George Washington 96 (J. Fitzpatrick ed., 1940); see also W. Taft, The Presidency: Its Duties, Its Powers, Its Opportunities and Its Limitations 11 (1916) (stating that the President "has no power to veto part of a bill and let the rest become a law"); cf. 1 W. Blackstone, Commentaries *154 ("The crown cannot begin of itself any alterations in the present established law; but it may approve or disapprove of the alterations suggested and consented to by the two houses").

[31] The lockbox procedure ensures that savings resulting from cancellations are used to reduce the deficit, rather than to offset deficit increases arising from other laws. See 2 U. S. C. §§ 691c(a)–(b) (1994 ed., Supp. II); see also H. R. Conf. Rep. No. 104–491, pp. 23–24 (1996). The Office of Management and Budget (OMB) estimates the deficit reduction resulting from each cancellation of new direct spending or limited tax benefit items and presents its estimate as a separate entry in the "pay-as-you-go" report submitted to Congress pursuant to § 252(d) of the Balanced Budget and Emergency Deficit Control Act of 1985 (or Gramm-Rudman-Hollings Act), 2 U. S. C. § 902(d). See § 691c(a)(2)(A) (1994 ed., Supp. II); see also H. R. Conf. Rep. No. 104–491, at 23. The "pay-as-you-go" requirement acts as a self-imposed limitation on Congress' ability to increase spending and/or reduce revenue: If spending increases are not offset by revenue increases (or if revenue reductions are not offset by spending reductions), then a "sequester" of the excess budgeted funds is required. See 2 U. S. C. §§ 900(b), 901(a)(1), 902(b), 906(*l*). OMB does not include the estimated savings resulting from a cancellation in the report it must submit under §§ 252(b) and 254 of the Balanced Budget and Emergency Deficit Control Act of 1985, 2 U. S. C. §§ 902(b), 904. See § 691c(a)(2)(B). By providing in this way that such savings "shall not be included in the pay-as-you-go balances," Congress ensures that "savings from the cancellation of new

budgetary effect" insofar as it prevents Congress and the President from spending the savings that result from the cancellation. Tr. of Oral Arg. 10.[32] The text of the Act expressly provides, however, that a cancellation prevents a direct spending or tax benefit provision "from having legal force or effect." 2 U. S. C. §§ 691e(4)(B)–(C). That a canceled item may have "real, legal budgetary effect" as a result of the lockbox procedure does not change the fact that by canceling the items at issue in these cases, the President made them entirely inoperative as to appellees. Section 968 of the Taxpayer Relief Act no longer provides a tax benefit, and § 4722(c) of the Balanced Budget Act of 1997 no longer relieves New York of its contingent liability.[33] Such significant changes do not lose their character simply because the canceled provisions may have some continuing financial effect on the Government.[34] The cancellation of one section of a statute may be the functional equivalent of a partial repeal even if a portion of the section is not canceled.

---

direct spending or limited tax benefits are devoted to deficit reduction and are not available to offset a deficit increase in another law." H. R. Conf. Rep. No. 104-491, at 23. Thus, the "pay-as-you-go" cap does not change upon cancellation because the canceled item is not treated as canceled. Moreover, if Congress enacts a disapproval bill, "OMB will not score this legislation as increasing the deficit under pay as you go." Ibid.

[32] The Snake River appellees have argued that the lockbox provisions have no such effect with respect to the canceled tax benefits at issue. Because we reject the Government's suggestion that the lockbox provisions alter our constitutional analysis, however, we find it unnecessary to resolve the dispute over the details of the lockbox procedure's applicability.

[33] Thus, although "Congress's use of infelicitous terminology cannot transform the cancellation into an unconstitutional amendment or repeal of an enacted law," Brief for Appellants 40-41 (citations omitted), the actual effect of a cancellation is entirely consistent with the language of the Act.

[34] Moreover, Congress always retains the option of statutorily amending or repealing the lockbox provisions and/or the Gramm-Rudman-Hollings Act, so as to eliminate any lingering financial effect of canceled items.

## V

The Government advances two related arguments to support its position that despite the unambiguous provisions of the Act, cancellations do not amend or repeal properly enacted statutes in violation of the Presentment Clause. First, relying primarily on *Field* v. *Clark*, 143 U. S. 649 (1892), the Government contends that the cancellations were merely exercises of discretionary authority granted to the President by the Balanced Budget Act and the Taxpayer Relief Act read in light of the previously enacted Line Item Veto Act. Second, the Government submits that the substance of the authority to cancel tax and spending items "is, in practical effect, no more and no less than the power to 'decline to spend' specified sums of money, or to 'decline to implement' specified tax measures." Brief for Appellants 40. Neither argument is persuasive.

In *Field* v. *Clark*, the Court upheld the constitutionality of the Tariff Act of 1890. Act of Oct. 1, 1890, 26 Stat. 567. That statute contained a "free list" of almost 300 specific articles that were exempted from import duties "unless otherwise specially provided for in this act." *Id.*, at 602. Section 3 was a special provision that directed the President to suspend that exemption for sugar, molasses, coffee, tea, and hides "whenever, and so often" as he should be satisfied that any country producing and exporting those products imposed duties on the agricultural products of the United States that he deemed to be "reciprocally unequal and unreasonable. . . ." *Id.*, at 612, quoted in *Field*, 143 U. S., at 680. The section then specified the duties to be imposed on those products during any such suspension. The Court provided this explanation for its conclusion that §3 had not delegated legislative power to the President:

"Nothing involving the expediency or the just operation of such legislation was left to the determination of the President. . . . [W]hen he ascertained the fact that duties

and exactions, reciprocally unequal and unreasonable, were imposed upon the agricultural or other products of the United States by a country producing and exporting sugar, molasses, coffee, tea or hides, it became his duty to issue a proclamation declaring the suspension, as to that country, which Congress had determined should occur. He had no discretion in the premises except in respect to the duration of the suspension so ordered. But that related only to the enforcement of the policy established by Congress. As the suspension was absolutely required when the President ascertained the existence of a particular fact, it cannot be said that in ascertaining that fact and in issuing his proclamation, in obedience to the legislative will, he exercised the function of making laws. . . . It was a part of the law itself as it left the hands of Congress that the provisions, full and complete in themselves, permitting the free introduction of sugars, molasses, coffee, tea and hides, from particular countries, should be suspended, in a given contingency, and that in case of such suspensions certain duties should be imposed." *Id.*, at 693.

This passage identifies three critical differences between the power to suspend the exemption from import duties and the power to cancel portions of a duly enacted statute. First, the exercise of the suspension power was contingent upon a condition that did not exist when the Tariff Act was passed: the imposition of "reciprocally unequal and unreasonable" import duties by other countries. In contrast, the exercise of the cancellation power within five days after the enactment of the Balanced Budget and Tax Reform Acts necessarily was based on the same conditions that Congress evaluated when it passed those statutes. Second, under the Tariff Act, when the President determined that the contingency had arisen, he had a duty to suspend; in contrast, while it is true that the President was required by the Act to make three determinations before he canceled a provision, see 2

U. S. C. § 691(a)(A) (1994 ed., Supp. II), those determinations did not qualify his discretion to cancel or not to cancel. Finally, whenever the President suspended an exemption under the Tariff Act, he was executing the policy that Congress had embodied in the statute. In contrast, whenever the President cancels an item of new direct spending or a limited tax benefit he is rejecting the policy judgment made by Congress and relying on his own policy judgment.[35] Thus, the conclusion in *Field* v. *Clark* that the suspensions mandated by the Tariff Act were not exercises of legislative power does not undermine our opinion that cancellations pursuant to the Line Item Veto Act are the functional equivalent of partial repeals of Acts of Congress that fail to satisfy Article I, § 7.

The Government's reliance upon other tariff and import statutes, discussed in *Field*, that contain provisions similar to the one challenged in *Field* is unavailing for the same reasons.[36] Some of those statutes authorized the President to "suspen[d] and discontinu[e]" statutory duties upon his determination that discriminatory duties imposed by other nations had been abolished. See 143 U. S., at 686–687 (discussing Act of Jan. 7, 1824, ch. 4, § 4, 4 Stat. 3, and Act of May 24, 1828, ch. 111, 4 Stat. 308).[37] A slightly different statute,

---

[35] For example, one reason that the President gave for canceling § 968 of the Taxpayer Relief Act was his conclusion that "this provision failed to target its benefits to small-and-medium size cooperatives." App. to Juris. Statement 71a (Cancellation No. 97–2); see n. 8, *supra*. Because the Line Item Veto Act requires the President to act within five days, *every* exercise of the cancellation power will necessarily be based on the same facts and circumstances that Congress considered, and therefore constitute a rejection of the policy choice made by Congress.

[36] The Court did not, of course, expressly consider in *Field* whether those statutes comported with the requirements of the Presentment Clause.

[37] Cf. 143 U. S., at 688 (discussing Act of Mar. 6, 1866, ch. 12, § 2, 14 Stat. 4, which permitted the President to "declare the provisions of this act to be inoperative" and lift import restrictions on foreign cattle and hides upon a showing that such importation would not endanger U. S. cattle).

Act of May 31, 1830, ch. 219, §2, 4 Stat. 425, provided that certain statutory provisions imposing duties on foreign ships "shall be repealed" upon the same no-discrimination determination by the President. See 143 U. S., at 687; see also *id.*, at 686 (discussing similar tariff statute, Act of Mar. 3, 1815, ch. 77, 3 Stat. 224, which provided that duties "are hereby repealed," "[s]uch repeal to take effect . . . whenever the President" makes the required determination).

The cited statutes all relate to foreign trade, and this Court has recognized that in the foreign affairs arena, the President has "a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved." *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304, 320 (1936). "Moreover, he, not Congress, has the better opportunity of knowing the conditions which prevail in foreign countries." *Ibid.*[38] More important, when enacting the statutes discussed in *Field,* Congress itself made the decision to suspend or repeal the particular provisions at issue upon the occurrence of particular events subsequent to enactment, and it left only the determination of whether such events occurred up to the President.[39] The Line Item Veto Act authorizes the President himself to effect the repeal of laws, for his own policy reasons, without observing the procedures set out in Article I, §7. The fact that Congress intended such a result is of no

---

[38] Indeed, the Court in *Field* v. *Clark,* 143 U. S. 649 (1892), so limited its reasoning: "[I]n the judgment of the legislative branch of the government, it is often desirable, if not essential for the protection of the interests of our people, against the unfriendly or discriminating regulations established by foreign governments, . . . to invest the President with large discretion in matters arising out of the execution of statutes relating to trade and commerce with other nations." *Id.,* at 691.

[39] See also *J. W. Hampton, Jr., & Co.* v. *United States,* 276 U. S. 394, 407 (1928) ("Congress may feel itself unable conveniently to determine exactly when its exercise of the legislative power should become effective, because dependent on future conditions, and it may leave the determination of such time to the decision of an Executive").

moment. Although Congress presumably anticipated that the President might cancel some of the items in the Balanced Budget Act and in the Taxpayer Relief Act, Congress cannot alter the procedures set out in Article I, § 7, without amending the Constitution.[40]

Neither are we persuaded by the Government's contention that the President's authority to cancel new direct spending and tax benefit items is no greater than his traditional authority to decline to spend appropriated funds. The Government has reviewed in some detail the series of statutes in which Congress has given the Executive broad discretion over the expenditure of appropriated funds. For example, the First Congress appropriated "sum[s] not exceeding" specified amounts to be spent on various Government operations. See, e. g., Act of Sept. 29, 1789, ch. 23, 1 Stat. 95; Act of Mar. 26, 1790, ch. 4, § 1, 1 Stat. 104; Act of Feb. 11, 1791, ch. 6, 1 Stat. 190. In those statutes, as in later years, the President was given wide discretion with respect to both the amounts to be spent and how the money would be allocated among different functions. It is argued that the Line Item Veto Act merely confers comparable discretionary authority over the expenditure of appropriated funds. The critical

---

[40] The Government argues that the Rules Enabling Act, 28 U. S. C. § 2072(b), permits this Court to "repeal" prior laws without violating Article I, § 7. Section 2072(b) provides that this Court may promulgate rules of procedure for the lower federal courts and that "[a]ll laws in conflict with such rules shall be of no further force or effect after such rules have taken effect." See *Sibbach* v. *Wilson & Co.*, 312 U. S. 1, 10 (1941) (stating that the procedural rules that this Court promulgates, "if they are within the authority granted by Congress, repeal" a prior inconsistent procedural statute); see also *Henderson* v. *United States*, 517 U. S. 654, 664 (1996) (citing § 2072(b)). In enacting § 2072(b), however, Congress expressly provided that laws inconsistent with the procedural rules promulgated by this Court would automatically be repealed upon the enactment of new rules in order to create a uniform system of rules for Article III courts. As in the tariff statutes, Congress itself made the decision to repeal prior rules upon the occurrence of a particular event—here, the promulgation of procedural rules by this Court.

difference between this statute and all of its predecessors, however, is that unlike any of them, this Act gives the President the unilateral power to change the text of duly enacted statutes. None of the Act's predecessors could even arguably have been construed to authorize such a change.

## VI

Although they are implicit in what we have already written, the profound importance of these cases makes it appropriate to emphasize three points.

First, we express no opinion about the wisdom of the procedures authorized by the Line Item Veto Act. Many members of both major political parties who have served in the Legislative and the Executive Branches have long advocated the enactment of such procedures for the purpose of "ensur-[ing] greater fiscal accountability in Washington." H. R. Conf. Rep. 104–491, p. 15 (1996).[41] The text of the Act was itself the product of much debate and deliberation in both Houses of Congress and that precise text was signed into law by the President. We do not lightly conclude that their action was unauthorized by the Constitution.[42] We have, however, twice had full argument and briefing on the question and have concluded that our duty is clear.

Second, although appellees challenge the validity of the Act on alternative grounds, the only issue we address concerns the "finely wrought" procedure commanded by the Constitution. *Chadha,* 462 U. S., at 951. We have been

---

[41] Cf. Taft, The Presidency, *supra* n. 30, at 21 ("A President with the power to veto items in appropriation bills might exercise a good restraining influence in cutting down the total annual expenses of the government. But this is not the right way").

[42] See *Bowsher,* 478 U. S., at 736 (STEVENS, J., concurring in judgment) ("When this Court is asked to invalidate a statutory provision that has been approved by both Houses of the Congress and signed by the President, particularly an Act of Congress that confronts a deeply vexing national problem, it should only do so for the most compelling constitutional reasons").

favored with extensive debate about the scope of Congress' power to delegate lawmaking authority, or its functional equivalent, to the President. The excellent briefs filed by the parties and their *amici curiae* have provided us with valuable historical information that illuminates the delegation issue but does not really bear on the narrow issue that is dispositive of these cases. Thus, because we conclude that the Act's cancellation provisions violate Article I, § 7, of the Constitution, we find it unnecessary to consider the District Court's alternative holding that the Act "impermissibly disrupts the balance of powers among the three branches of government." 985 F. Supp., at 179.[43]

Third, our decision rests on the narrow ground that the procedures authorized by the Line Item Veto Act are not authorized by the Constitution. The Balanced Budget Act of 1997 is a 500-page document that became "Public Law 105–33" after three procedural steps were taken: (1) a bill containing its exact text was approved by a majority of the Members of the House of Representatives; (2) the Senate approved precisely the same text; and (3) that text was signed into law by the President. The Constitution explicitly requires that each of those three steps be taken before a bill may "become a law." Art. I, § 7. If one paragraph of that text had been omitted at any one of those three stages, Public Law 105–33 would not have been validly enacted. If the Line Item Veto Act were valid, it would authorize the President to create a different law—one whose text was not voted on by either House of Congress or presented to the President for signature. Something that might be known as "Public Law 105–33 as modified by the President" may or

---

[43] We also find it unnecessary to consider whether the provisions of the Act relating to discretionary budget authority are severable from the Act's tax benefit and direct spending provisions. We note, however, that the Act contains no severability clause; a severability provision that had appeared in the Senate bill was dropped in conference without explanation. H. R. Conf. Rep. No. 104–491, at 17, 41.

may not be desirable, but it is surely not a document that may "become a law" pursuant to the procedures designed by the Framers of Article I, § 7, of the Constitution.

If there is to be a new procedure in which the President will play a different role in determining the final text of what may "become a law," such change must come not by legislation but through the amendment procedures set forth in Article V of the Constitution. Cf. *U. S. Term Limits, Inc.* v. *Thornton*, 514 U. S. 779, 837 (1995).

The judgment of the District Court is affirmed.

*It is so ordered.*

JUSTICE KENNEDY, concurring.

A Nation cannot plunder its own treasury without putting its Constitution and its survival in peril. The statute before us, then, is of first importance, for it seems undeniable the Act will tend to restrain persistent excessive spending. Nevertheless, for the reasons given by JUSTICE STEVENS in the opinion for the Court, the statute must be found invalid. Failure of political will does not justify unconstitutional remedies.

I write to respond to my colleague JUSTICE BREYER, who observes that the statute does not threaten the liberties of individual citizens, a point on which I disagree. See *post*, at 496–497. The argument is related to his earlier suggestion that our role is lessened here because the two political branches are adjusting their own powers between themselves. *Post*, at 472, 482–483. To say the political branches have a somewhat free hand to reallocate their own authority would seem to require acceptance of two premises: first, that the public good demands it, and second, that liberty is not at risk. The former premise is inadmissible. The Constitution's structure requires a stability which transcends the convenience of the moment. See *Metropolitan Washington Airports Authority* v. *Citizens for Abatement of Aircraft Noise, Inc.*, 501 U. S. 252, 276–277 (1991); *Bowsher* v. *Synar*,

478 U. S. 714, 736 (1986); *INS* v. *Chadha,* 462 U. S. 919, 944–945, 958–959 (1983); *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.,* 458 U. S. 50, 73–74 (1982). The latter premise, too, is flawed. Liberty is always at stake when one or more of the branches seek to transgress the separation of powers.

Separation of powers was designed to implement a fundamental insight: Concentration of power in the hands of a single branch is a threat to liberty. The Federalist states the axiom in these explicit terms: "The accumulation of all powers, legislative, executive, and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny." The Federalist No. 47, p. 301 (C. Rossiter ed. 1961). So convinced were the Framers that liberty of the person inheres in structure that at first they did not consider a Bill of Rights necessary. The Federalist No. 84, pp. 513, 515; G. Wood, The Creation of the American Republic 1776–1787, pp. 536–543 (1969). It was at Madison's insistence that the First Congress enacted the Bill of Rights. R. Goldwin, From Parchment to Power 75–153 (1997). It would be a grave mistake, however, to think a Bill of Rights in Madison's scheme then or in sound constitutional theory now renders separation of powers of lesser importance. See Amar, The Bill of Rights as a Constitution, 100 Yale L. J. 1131, 1132 (1991).

In recent years, perhaps, we have come to think of liberty as defined by that word in the Fifth and Fourteenth Amendments and as illuminated by the other provisions of the Bill of Rights. The conception of liberty embraced by the Framers was not so confined. They used the principles of separation of powers and federalism to secure liberty in the fundamental political sense of the term, quite in addition to the idea of freedom from intrusive governmental acts. The idea and the promise were that when the people delegate some degree of control to a remote central authority, one branch of government ought not possess the power to shape their destiny without a sufficient check from the other two. In this vision, liberty demands limits on the ability of any one

branch to influence basic political decisions. Quoting Montesquieu, the Federalist Papers made the point in the following manner:

> " 'When the legislative and executive powers are united in the same person or body,' says he, 'there can be no liberty, because apprehensions may arise lest *the same* monarch or senate should *enact* tyrannical laws to *execute* them in a tyrannical manner.' Again: 'Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for *the judge* would then be *the legislator.* Were it joined to the executive power, *the judge* might behave with all the violence of *an oppressor.*' " The Federalist No. 47, *supra,* at 303.

It follows that if a citizen who is taxed has the measure of the tax or the decision to spend determined by the Executive alone, without adequate control by the citizen's Representatives in Congress, liberty is threatened. Money is the instrument of policy and policy affects the lives of citizens. The individual loses liberty in a real sense if that instrument is not subject to traditional constitutional constraints.

The principal object of the statute, it is true, was not to enhance the President's power to reward one group and punish another, to help one set of taxpayers and hurt another, to favor one State and ignore another. Yet these are its undeniable effects. The law establishes a new mechanism which gives the President the sole ability to hurt a group that is a visible target, in order to disfavor the group or to extract further concessions from Congress. The law is the functional equivalent of a line item veto and enhances the President's powers beyond what the Framers would have endorsed.

It is no answer, of course, to say that Congress surrendered its authority by its own hand; nor does it suffice to point out that a new statute, signed by the President or

enacted over his veto, could restore to Congress the power it now seeks to relinquish. That a congressional cession of power is voluntary does not make it innocuous. The Constitution is a compact enduring for more than our time, and one Congress cannot yield up its own powers, much less those of other Congresses to follow. See *Freytag* v. *Commissioner*, 501 U. S. 868, 880 (1991); cf. *Chadha, supra,* at 942, n. 13. Abdication of responsibility is not part of the constitutional design.

Separation of powers helps to ensure the ability of each branch to be vigorous in asserting its proper authority. In this respect the device operates on a horizontal axis to secure a proper balance of legislative, executive, and judicial authority. Separation of powers operates on a vertical axis as well, between each branch and the citizens in whose interest powers must be exercised. The citizen has a vital interest in the regularity of the exercise of governmental power. If this point was not clear before *Chadha,* it should have been so afterwards. Though *Chadha* involved the deportation of a person, while the case before us involves the expenditure of money or the grant of a tax exemption, this circumstance does not mean that the vertical operation of the separation of powers is irrelevant here. By increasing the power of the President beyond what the Framers envisioned, the statute compromises the political liberty of our citizens, liberty which the separation of powers seeks to secure.

The Constitution is not bereft of controls over improvident spending. Federalism is one safeguard, for political accountability is easier to enforce within the States than nationwide. The other principal mechanism, of course, is control of the political branches by an informed and responsible electorate. Whether or not federalism and control by the electorate are adequate for the problem at hand, they are two of the structures the Framers designed for the problem the statute strives to confront. The Framers of the Consti-

tution could not command statesmanship. They could simply provide structures from which it might emerge. The fact that these mechanisms, plus the proper functioning of the separation of powers itself, are not employed, or that they prove insufficient, cannot validate an otherwise unconstitutional device. With these observations, I join the opinion of the Court.

JUSTICE SCALIA, with whom JUSTICE O'CONNOR joins, and with whom JUSTICE BREYER joins as to Part III, concurring in part and dissenting in part.

Today the Court acknowledges the "'overriding and time-honored concern about keeping the Judiciary's power within its proper constitutional sphere.'" *Ante*, at 421, quoting *Raines* v. *Byrd*, 521 U. S. 811, 820 (1997). It proceeds, however, to ignore the prescribed statutory limits of our jurisdiction by permitting the expedited-review provisions of the Line Item Veto Act to be invoked by persons who are not "individual[s]," 2 U. S. C. § 692 (1994 ed., Supp. II); and to ignore the constitutional limits of our jurisdiction by permitting one party to challenge the Government's denial *to another party* of favorable tax treatment from which the first party might, but just as likely might not, gain a concrete benefit. In my view, the Snake River appellees lack standing to challenge the President's cancellation of the "limited tax benefit," and the constitutionality of that action should not be addressed. I think the New York appellees have standing to challenge the President's cancellation of an "item of new direct spending"; I believe we have statutory authority (other than the expedited-review provision) to address that challenge; but unlike the Court I find the President's cancellation of spending items to be entirely in accord with the Constitution.

I

The Court's unrestrained zeal to reach the merits of this case is evident in its disregard of the statute's expedited-

review provision, which extends that special procedure to "[a]ny Member of Congress or any individual adversely affected by [the Act]." § 692. With the exception of Mike Cranney, a natural person, the appellees—corporations, co-operatives, and governmental entities—are not "individuals" under any accepted usage of that term. Worse still, the first provision of the United States Code confirms that insofar as this word is concerned, Congress speaks English like the rest of us: "In determining the meaning of any Act of Congress, unless the context indicates otherwise . . . the wor[d] 'person' . . . include[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, *as well as individuals*." 1 U. S. C. § 1 (emphasis added). And doubly worse, one of the definitional provisions of this very Act expressly distinguishes "individuals" from "persons." A tax law does not create a "limited tax benefit," it says, so long as

> "any difference in the treatment of *persons* is based solely on—
> "(I) in the case of *businesses and associations*, the size or form of the business or association involved;
> "(II) in the case of *individuals*, general demographic conditions, such as income, marital status, number of dependents, or tax return filing status . . . ." 2 U. S. C. § 691e(9)(B)(iii) (1994 ed., Supp. II) (emphasis added).

The Court majestically sweeps the plain language of the statute aside, declaring that "[t]here is no plausible reason why Congress would have intended to provide for such special treatment of actions filed by natural persons and to have precluded entirely jurisdiction over comparable cases brought by corporate persons." *Ante*, at 429. Indeed, the Court says, it would be "absurd" for Congress to have done so. *Ibid.* But Congress treats individuals more favorably than corporations and other associations *all the time*. There is nothing whatever extraordinary—and surely nothing so

bizarre as to permit this Court to declare a "scrivener's error"—in believing that individuals will suffer more seriously from delay in the receipt of "vetoed" benefits or tax savings than corporations will, and therefore according individuals (but not corporations) expedited review. It may be unlikely that this is what Congress actually had in mind; but it is what Congress said, it is not so absurd as to be an obvious mistake, and it is therefore the law.

The only individual who has sued, and thus the only appellee who qualifies for expedited review under § 692, is Mike Cranney. Since § 692 does not confer jurisdiction over the claims of the other appellees, we must dismiss them, unless we have jurisdiction under another statute. In their complaints, appellees sought declaratory relief not only under § 692(a), but also under the Declaratory Judgment Act, 28 U. S. C. § 2201, invoking the District Court's jurisdiction under 28 U. S. C. § 1331. After the District Court ruled, the Government appealed directly to this Court, but it also filed a notice of appeal to the Court of Appeals for the District of Columbia Circuit. In light of the Government's representation that it desires "[t]o eliminate any possibility that the district court's decision might escape review," Reply Brief for Appellants 2, n. 1, I would deem its appeal to this Court a petition for writ of certiorari before judgment, see 28 U. S. C. § 2101(e), and grant it. Under this Court's Rule 11, "[a] petition for a writ of certiorari to review a case pending in a United States court of appeals, before judgment is entered in that court, will be granted only upon a showing that the case is of such imperative public importance as to justify deviation from normal appellate practice and to require immediate determination in this Court." In light of the public importance of the issues involved, and the little sense it would make for the Government to pursue its appeal against one appellee in this Court and against the others in the Court of Appeals, the entire case, in my view, qualifies for certiorari review before judgment.

## II

Not only must we be satisfied that we have statutory jurisdiction to hear this case; we must be satisfied that we have jurisdiction under Article III. "To meet the standing requirements of Article III, '[a] plaintiff must allege *personal injury* fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" *Raines,* 521 U. S., at 818, quoting *Allen* v. *Wright,* 468 U. S. 737, 751 (1984).

In the first action before us, appellees Snake River Potato Growers, Inc. (Snake River) and Mike Cranney, Snake River's Director and Vice-Chairman, challenge the constitutionality of the President's cancellation of § 968 of the Taxpayer Relief Act of 1997. The Snake River appellees have standing, in the Court's view, because § 968 gave them "the equivalent of a statutory 'bargaining chip,'" and "[b]y depriving them of their statutory bargaining chip, the cancellation inflicted a sufficient likelihood of economic injury to establish standing under our precedents." *Ante,* at 432. It is unclear whether the Court means that deprivation of a "bargaining chip" itself suffices for standing, or that such deprivation suffices in the present case because it creates a likelihood of economic injury. The former is wrong as a matter of law, and the latter is wrong as a matter of fact, on the facts alleged.

For the proposition that "a denial of a benefit in the bargaining process" can suffice for standing the Court relies in a footnote, see *ante,* at 433, n. 22, on *Northeastern Fla. Chapter, Associated Gen. Contractors of America* v. *Jacksonville,* 508 U. S. 656 (1993). There, an association of contractors alleged that a city ordinance according racial preferences in the award of city contracts denied its members equal protection of the laws. *Id.,* at 658–659. The association's members had regularly bid on and performed city contracts, and would have bid on designated set-aside contracts but for the ordinance. *Id.,* at 659. We held that the association had

standing even without proof that its members would have been awarded contracts absent the challenged discrimination. The reason, we explained, is that "[t]he 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id.*, at 666, citing two earlier equal protection cases, *Turner* v. *Fouche*, 396 U. S. 346, 362 (1970), and *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469, 493 (1989). In other words, *Northeastern Florida* did not hold, as the Court suggests, that harm to one's bargaining position is an "injury in fact," but rather that, in an equal protection case, the denial of equal treatment is. Inasmuch as Snake River does not challenge the Line Item Veto Act on equal protection grounds, *Northeastern Florida* is inapposite. And I know of no case outside the equal protection field in which the mere detriment to one's "bargaining position," as opposed to a demonstrated loss of some bargain, has been held to confer standing. The proposition that standing is established by the mere reduction in one's chances of receiving a financial benefit is contradicted by *Simon* v. *Eastern Ky. Welfare Rights Organization*, 426 U. S. 26 (1976), which held that low-income persons who had been denied treatment at local hospitals lacked standing to challenge an Internal Revenue Service (IRS) ruling that reduced the amount of charitable care necessary for the hospitals to qualify for tax-exempt status. The situation in that case was strikingly similar to the one before us here: The denial of a tax benefit to a third party was alleged to reduce the chances of a financial benefit to the plaintiffs. And standing was denied.

But even if harm to one's bargaining position *were* a legally cognizable injury, Snake River has not alleged, as it must, facts sufficient to demonstrate that *it personally* has suffered that injury. See *Warth* v. *Seldin*, 422 U. S. 490, 502 (1975). In *Eastern Ky. Welfare Rights, supra,* the plaintiffs at least had *applied* for the financial benefit which had alleg-

edly been rendered less likely of receipt; the present suit, by contrast, resembles a complaint asserting that the plaintiff's chances of winning the lottery were reduced, filed by a plaintiff who never bought a lottery ticket, or who tore it up before the winner was announced. Snake River has presented no evidence to show that it was engaged in bargaining, and that that bargaining was impaired by the President's cancellation of § 968. The Court says that Snake River "was engaged in ongoing negotiations with the owner of a processing plant who had expressed an interest in structuring a tax-deferred sale when the President canceled § 968," *ante*, at 432. There is, however, no evidence of "negotiations," only of two "discussions." According to the affidavit of Mike Cranney:

> "On or about May 1997, I spoke with Howard Phillips, the principal owner of Idaho Potato Packers, concerning the possibility that, if the Cooperative Tax Act were passed, Snake River Potato Growers might purchase a Blackfoot, Idaho processing facility in a transaction that would allow the deferral of gain. Mr. Phillips expressed an interest in such a transaction if the Cooperative Tax Act were to pass. Mr. Phillips also acknowledged to me that Jim Chapman, our General Manager, had engaged him in a previous discussion concerning this matter." App. 112.

This affidavit would have set forth something of significance if it had said that Phillips had expressed an interest in the transaction "if *and only if* the Cooperative Tax Act were to pass." But of course it is most unlikely he said that; Idaho Potato Packers (IPP) could get just as much from the sale without the Act as with the Act, so long as the price was right. The affidavit would also have set forth something of significance if it had said that Phillips had expressed an interest in the sale "at a particular price if the Cooperative Tax Act were to pass." But it does not say that either.

Nor does it even say that the President's action caused IPP to reconsider. Moreover, it was Snake River, not IPP, that terminated the discussions. According to Cranney, "[t]he President's cancellation of the Cooperative Tax Act caused me to terminate discussions with Phillips about the possibility of Snake River Potato Growers buying the Idaho Potato Packers facility." *Id.*, at 114. So all we know from the record is that Snake River had two discussions with IPP concerning the sale of its processing facility on the tax deferred basis the Act would allow; that IPP was interested; and that Snake River ended the discussions after the President's action. We do not know that Snake River was prepared to offer a price—tax deferral or no—that would cross IPP's laugh threshold. We do not even know for certain that the tax deferral was a significant attraction to IPP; we know only that Cranney thought it was. On these facts—which never even bring things to the *point* of bargaining—it is pure conjecture to say that Snake River suffered an impaired bargaining position. As we have said many times, conjectural or hypothetical injuries do not suffice for Article III standing. See *Lujan* v. *Defenders of Wildlife,* 504 U. S. 555, 560 (1992).

Nor has Snake River demonstrated, as the Court finds, that "the cancellation inflicted a sufficient likelihood of economic injury to establish standing under our precedents." *Ante,* at 432. Presumably the economic injury the Court has in mind is Snake River's loss of a bargain purchase of a processing plant. But there is no evidence, and indeed not even an allegation, that before the President's action such a purchase was *likely.* The most that Snake River alleges is that the President's action rendered it "more difficult for plaintiffs to purchase qualified processors," App. 12. And even if that abstract "increased difficulty" sufficed for injury in fact (which it does not), the existence of *even that* is pure speculation. For all that appears, *no* owner of a processing plant would have been willing to sell to Snake

River at *any* price that Snake River could afford—and the impossible cannot be made "more difficult." All we know is that a potential seller was "interested" in talking about the subject before the President's action, and that after the President's action Snake River itself decided to proceed no further. If this establishes a "likelihood" that Snake River would have made a bargain purchase but for the President's action, or even a "likelihood" that the President's action rendered "more difficult" a purchase that was realistically within Snake River's grasp, then we must adopt for our standing jurisprudence a new definition of likely: "plausible."

Twice before have we addressed whether plaintiffs had standing to challenge the Government's tax treatment of a third party, and twice before have we held that the speculative nature of a third party's response to changes in federal tax laws defeats standing. In *Simon* v. *Eastern Ky. Welfare Rights*, 426 U. S. 26 (1976), we found it "purely speculative whether the denials of service . . . fairly can be traced to [the IRS's] 'encouragement' or instead result from decisions made by the hospitals without regard to the tax implications." *Id.*, at 42–43. We found it "equally speculative whether the desired exercise of the court's remedial powers in this suit would result in the availability to respondents of such services." *Id.*, at 43. In *Allen* v. *Wright*, 468 U. S. 737 (1984), we held that parents of black children attending public schools lacked standing to challenge IRS policies concerning tax exemptions for private schools. The parents alleged, *inter alia*, that "federal tax exemptions to racially discriminatory private schools in their communities impair their ability to have their public schools desegregated." *Id.*, at 752–753. We concluded that "the injury alleged is not fairly traceable to the Government conduct . . . challenge[d] as unlawful," *id.*, at 757, and that "it is entirely speculative . . . whether withdrawal of a tax exemption from any particular school would lead the school to change its policies," *id.*, at 758. Likewise, here, it is purely speculative whether a tax

deferral would have prompted any sale, let alone one that reflected the tax benefit in the sale price.

The closest case the Court can appeal to as precedent for its finding of standing is *Bryant* v. *Yellen*, 447 U. S. 352 (1980). Even on its own terms, *Bryant* is distinguishable. As that case came to us, it involved a dispute between a class of some 800 landowners in the Imperial Valley, each of whom owned more than 160 acres, and a group of Imperial Valley residents who wished to purchase lands owned by that class. The point at issue was the application to those lands of a statutory provision that forbade delivery of water from a federal reclamation project to irrigable land held by a single owner in excess of 160 acres, and that limited the sale price of any lands so held in excess of 160 acres to a maximum amount, fixed by the Secretary of the Interior, based on fair market value in 1929, before the valley was irrigated by water from the Boulder Canyon Project. *Id.*, at 366–367. That price would of course be "far below [the lands'] current market values." *Id.*, at 367, n. 17. The Court concluded that the would-be purchasers "had a sufficient stake in the outcome of the controversy to afford them standing." *Id.*, at 368. It is true, as the Court today emphasizes, that the purchasers had not presented "detailed information about [their] financial resources," but the Court thought that unnecessary only because "purchasers of such land would stand to reap significant gains on resale." *Id.*, at 367, n. 17. Financing, in other words, would be easy to come by. Here, by contrast, not only do we have no notion whether Snake River has the cash in hand to afford IPP's bottom-line price, but we also have no reason to believe that financing of the purchase will be readily available. Potato processing plants, unlike agricultural land in the Imperial Valley, do not have a readily available resale market. On the other side of the equation, it was also much clearer in *Bryant* that if the suit came out in the would-be purchasers' favor, many of the landowners would be willing to sell. The alternative would be

withdrawing the land from agricultural production, whereas sale—even at bargain-basement prices for the land—would at least enable recoupment of the cost of improvements, such as drainage systems. *Ibid.* In the present case, by contrast, we have no reason to believe that IPP is not operating its processing plant at a profit, and will not continue to do so in the future; Snake River has proffered no evidence that IPP or any other processor *would surely have sold* if only the President had not canceled the tax deferral. The only uncertainty in *Bryant* was whether any of the respondents would wind up as buyers of any of the excess land; that seemed probable enough, since "respondents are residents of the Imperial Valley who desire to purchase the excess land for purposes of farming." *Ibid.* We have no basis to say that it is "likely" that Snake River would have purchased a processing facility if § 968 had not been canceled.

More fundamentally, however, the reasoning of *Bryant* should not govern the present case because it represents a crabbed view of the standing doctrine that has been superseded. *Bryant* was decided at the tail-end of "an era in which it was thought that the only function of the constitutional requirement of standing was 'to assure that concrete adverseness which sharpens the presentation of issues,'" *Spencer* v. *Kemna,* 523 U. S. 1, 11 (1998), quoting *Baker* v. *Carr,* 369 U. S. 186, 204 (1962). Thus, the *Bryant* Court ultimately afforded the respondents standing simply because they "had a sufficient stake in the outcome of the controversy," 447 U. S., at 368, not because they had demonstrated injury in fact, causation, and redressability. "That parsimonious view of the function of Article III standing has since yielded to the acknowledgment that the constitutional requirement is a 'means of "defin[ing] the role assigned to the judiciary in a tripartite allocation of power," ' and 'a part of the basic charter . . . provid[ing] for the interaction between [the federal] government and the governments of the several States,'" *Spencer, supra,* at 11–12, quoting *Valley Forge*

*Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U. S. 464, 474, 476 (1982). While Snake River in the present case may indeed have enough of a "stake" to assure adverseness, the matter it brings before us is inappropriate for our resolution because its allegations do not establish an injury in fact, attributable to the Presidential action it challenges, and remediable by this Court's invalidation of that Presidential action.

Because, in my view, Snake River has no standing to bring this suit, we have no jurisdiction to resolve its challenge to the President's authority to cancel a "limited tax benefit."

### III

I agree with the Court that the New York appellees have standing to challenge the President's cancellation of § 4722(c) of the Balanced Budget Act of 1997 as an "item of new direct spending." See *ante*, at 430–431. The tax liability they will incur under New York law is a concrete and particularized injury, fairly traceable to the President's action, and avoided if that action is undone. Unlike the Court, however, I do not believe that Executive cancellation of this item of direct spending violates the Presentment Clause.

The Presentment Clause requires, in relevant part, that "[e]very Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it." U. S. Const., Art. I, § 7, cl. 2. There is no question that enactment of the Balanced Budget Act complied with these requirements: the House and Senate passed the bill, and the President signed it into law. It was only *after* the requirements of the Presentment Clause had been satisfied that the President exercised his authority under the Line Item Veto Act to cancel the spending item. Thus, the Court's problem with the Act is not that it authorizes the President to veto parts of a bill and sign others into law, but rather that it authorizes

him to "cancel"—prevent from "having legal force or effect"—certain parts of duly enacted statutes.

Article I, § 7, of the Constitution obviously prevents the President from canceling a law that Congress has not authorized him to cancel. Such action cannot possibly be considered part of his execution of the law, and if it is legislative action, as the Court observes, "'repeal of statutes, no less than enactment, must conform with Art. I.'" *Ante,* at 438, quoting from *INS* v. *Chadha,* 462 U. S. 919, 954 (1983). But that is not this case. It was certainly arguable, as an original matter, that Art. I, § 7, also prevents the President from canceling a law which itself *authorizes* the President to cancel it. But as the Court acknowledges, that argument has long since been made and rejected. In 1809, Congress passed a law authorizing the President to cancel trade restrictions against Great Britain and France if either revoked edicts directed at the United States. Act of Mar. 1, 1809, § 11, 2 Stat. 528. Joseph Story regarded the conferral of that authority as entirely unremarkable in *The Orono,* 18 F. Cas. 830 (No. 10,585) (CCD Mass. 1812). The Tariff Act of 1890 authorized the President to "suspend, by proclamation to that effect" certain of its provisions if he determined that other countries were imposing "reciprocally unequal and unreasonable" duties. Act of Oct. 1, 1890, § 3, 26 Stat. 612. This Court upheld the constitutionality of that Act in *Field* v. *Clark,* 143 U. S. 649 (1892), reciting the history since 1798 of statutes conferring upon the President the power to, *inter alia,* "discontinue the prohibitions and restraints hereby enacted and declared," *id.,* at 684, "suspend the operation of the aforesaid act," *id.,* at 685, and "declare the provisions of this act to be inoperative," *id.,* at 688.

As much as the Court goes on about Art. I, § 7, therefore, that provision does not demand the result the Court reaches. It no more categorically prohibits the Executive *reduction* of congressional dispositions in the course of implementing statutes that authorize such reduction, than it categorically

prohibits the Executive *augmentation* of congressional dispositions in the course of implementing statutes that authorize such augmentation—generally known as substantive rulemaking. There are, to be sure, limits upon the former just as there are limits upon the latter—and I am prepared to acknowledge that the limits upon the former may be much more severe. Those limits are established, however, not by some categorical prohibition of Art. I, § 7, which our cases conclusively disprove, but by what has come to be known as the doctrine of unconstitutional delegation of legislative authority: When authorized Executive reduction or augmentation is allowed to go too far, it usurps the nondelegable function of Congress and violates the separation of powers.

It is this doctrine, and not the Presentment Clause, that was discussed in the *Field* opinion, and it is this doctrine, and not the Presentment Clause, that is the issue presented by the statute before us here. That is why the Court is correct to distinguish prior authorizations of Executive cancellation, such as the one involved in *Field*, on the ground that they were contingent upon an Executive finding of fact, and on the ground that they related to the field of foreign affairs, an area where the President has a special "'degree of discretion and freedom,'" *ante*, at 445 (citation omitted). These distinctions have nothing to do with whether the details of Art. I, § 7, have been complied with, but everything to do with whether the authorizations went too far by transferring to the Executive a degree of political, lawmaking power that our traditions demand be retained by the Legislative Branch.

I turn, then, to the crux of the matter: whether Congress's authorizing the President to cancel an item of spending gives him a power that our history and traditions show must reside exclusively in the Legislative Branch. I may note, to begin with, that the Line Item Veto Act is not the first statute to authorize the President to "cancel" spending items. In *Bowsher* v. *Synar*, 478 U. S. 714 (1986), we addressed the

constitutionality of the Balanced Budget and Emergency Deficit Control Act of 1985, 2 U. S. C. § 901 *et seq.* (1982 ed., Supp. III), which required the President, if the federal budget deficit exceeded a certain amount, to issue a "sequestration" order mandating spending reductions specified by the Comptroller General, § 902. The effect of sequestration was that "amounts sequestered . . . shall be *permanently cancelled.*" § 902(a)(4) (emphasis added). We held that the Act was unconstitutional, not because it impermissibly gave the Executive legislative power, but because it gave the Comptroller General, an officer of the Legislative Branch over whom Congress retained removal power, "the ultimate authority to determine the budget cuts to be made," 478 U. S., at 733, "functions . . . *plainly entailing execution of the law in constitutional terms,*" *id.*, at 732–733 (emphasis added). The President's discretion under the Line Item Veto Act is certainly broader than the Comptroller General's discretion was under the 1985 Act, but it is no broader than the discretion traditionally granted the President in his execution of spending laws.

Insofar as the degree of political, "lawmaking" power conferred upon the Executive is concerned, there is not a dime's worth of difference between Congress's authorizing the President to *cancel* a spending item, and Congress's authorizing money to be spent on a particular item at the President's discretion. And the latter has been done since the founding of the Nation. From 1789–1791, the First Congress made lump-sum appropriations for the entire Government—"sum[s] not exceeding" specified amounts for broad purposes. Act of Sept. 29, 1789, ch. 23, 1 Stat. 95; Act of Mar. 26, 1790, ch. 4, § 1, 1 Stat. 104; Act of Feb. 11, 1791, ch. 6, 1 Stat. 190. From a very early date Congress also made permissive individual appropriations, leaving the decision whether to spend the money to the President's unfettered discretion. In 1803, it appropriated $50,000 for the President to build "not exceeding fifteen gun boats, to be armed,

manned and fitted out, and employed for such purposes as in his opinion the public service may require," Act of Feb. 28, 1803, ch. 11, §3, 2 Stat. 206. President Jefferson reported that "[t]he sum of fifty thousand dollars appropriated by Congress for providing gun boats remains unexpended. The favorable and peaceable turn of affairs on the Mississippi rendered an immediate execution of that law unnecessary," 13 Annals of Cong. 14 (1803). Examples of appropriations committed to the discretion of the President abound in our history. During the Civil War, an Act appropriated over $76 million to be divided among various items "as the exigencies of the service may require," Act of Feb. 25, 1862, ch. 32, 12 Stat. 344–345. During the Great Depression, Congress appropriated $950 million "for such projects and/or purposes and under such rules and regulations as the President in his discretion may prescribe," Act of Feb. 15, 1934, ch. 13, 48 Stat. 351, and $4 billion for general classes of projects, the money to be spent "in the discretion and under the direction of the President," Emergency Relief Appropriation Act of 1935, 49 Stat. 115. The constitutionality of such appropriations has never seriously been questioned. Rather, "[t]hat Congress has wide discretion in the matter of prescribing details of expenditures for which it appropriates must, of course, be plain. Appropriations and other acts of Congress are replete with instances of general appropriations of large amounts, to be allotted and expended as directed by designated government agencies." *Cincinnati Soap Co.* v. *United States*, 301 U. S. 308, 321–322 (1937).

Certain Presidents have claimed Executive authority to withhold appropriated funds even *absent* an express conferral of discretion to do so. In 1876, for example, President Grant reported to Congress that he would not spend money appropriated for certain harbor and river improvements, see Act of Aug. 14, 1876, ch. 267, 19 Stat. 132, because "[u]nder no circumstances [would he] allow expenditures upon works not clearly national," and in his view, the appropriations

were for "works of purely private or local interest, in no sense national," 4 Cong. Rec. 5628. President Franklin D. Roosevelt impounded funds appropriated for a flood control reservoir and levee in Oklahoma. See Act of Aug. 18, 1941, ch. 377, 55 Stat. 638, 645; Hearings on S. 373 before the Ad Hoc Subcommittee on Impoundment of Funds of the Committee on Government Operations and the Subcommittee on Separation of Powers of the Senate Committee on the Judiciary, 93d Cong., 1st Sess., 848–849 (1973). President Truman ordered the impoundment of hundreds of millions of dollars that had been appropriated for military aircraft. See Act of Oct. 29, 1949, ch. 787, 63 Stat. 987, 1013; Public Papers of the Presidents of the United States, Harry S. Truman, 1949, pp. 538–539 (W. Reid ed. 1964). President Nixon, the Mahatma Gandhi of all impounders, asserted at a press conference in 1973 that his "constitutional right" to impound appropriated funds was "absolutely clear." The President's News Conference of Jan. 31, 1973, 9 Weekly Comp. of Pres. Doc. 109–110 (1973). Our decision two years later in *Train* v. *City of New York*, 420 U. S. 35 (1975), proved him wrong, but it implicitly confirmed that Congress may confer discretion upon the Executive to withhold appropriated funds, even funds appropriated for a specific purpose. The statute at issue in *Train* authorized spending "not to exceed" specified sums for certain projects, and directed that such "[s]ums authorized to be appropriated . . . shall be allotted" by the Administrator of the Environmental Protection Agency, 33 U. S. C. §§ 1285, 1287 (1970 ed., Supp. III). Upon enactment of this statute, the President directed the Administrator to allot no more than a certain part of the amount authorized. 420 U. S., at 40. This Court held, as a matter of statutory interpretation, that the statute *did not grant* the Executive discretion to withhold the funds, but required allotment of the full amount authorized. *Id.*, at 44–47.

The short of the matter is this: Had the Line Item Veto Act authorized the President to "decline to spend" any item

of spending contained in the Balanced Budget Act of 1997, there is not the slightest doubt that authorization would have been constitutional. What the Line Item Veto Act does instead—authorizing the President to "cancel" an item of spending—is technically different. But the technical difference does *not* relate to the technicalities of the Presentment Clause, which have been fully complied with; and the doctrine of unconstitutional delegation, which *is* at issue here, is preeminently *not* a doctrine of technicalities. The title of the Line Item Veto Act, which was perhaps designed to simplify for public comprehension, or perhaps merely to comply with the terms of a campaign pledge, has succeeded in faking out the Supreme Court. The President's action it authorizes in fact is not a line-item veto and thus does not offend Art. I, § 7; and insofar as the substance of that action is concerned, it is no different from what Congress has permitted the President to do since the formation of the Union.

## IV

I would hold that the President's cancellation of § 4722(c) of the Balanced Budget Act of 1997 as an item of direct spending does not violate the Constitution. Because I find no party before us who has standing to challenge the President's cancellation of § 968 of the Taxpayer Relief Act of 1997, I do not reach the question whether that violates the Constitution.

For the foregoing reasons, I respectfully dissent.

JUSTICE BREYER, with whom JUSTICE O'CONNOR and JUSTICE SCALIA join as to Part III, dissenting.

## I

I agree with the Court that the parties have standing, but I do not agree with its ultimate conclusion. In my view the Line Item Veto Act (Act) does not violate any specific textual constitutional command, nor does it violate any implicit

470

separation-of-powers principle. Consequently, I believe that the Act is constitutional.

## II

I approach the constitutional question before us with three general considerations in mind. *First,* the Act represents a legislative effort to provide the President with the power to give effect to some, but not to all, of the expenditure and revenue-diminishing provisions contained in a single massive appropriations bill. And this objective is constitutionally proper.

When our Nation was founded, Congress could easily have provided the President with this kind of power. In that time period, our population was less than 4 million, see U. S. Dept. of Commerce, Census Bureau, Historical Statistics of the United States: Colonial Times to 1970, pt. 1, p. 8 (1975), federal employees numbered fewer than 5,000, see *id.,* pt. 2, at 1103, annual federal budget outlays totaled approximately $4 million, see *id.,* pt. 2, at 1104, and the entire operative text of Congress' first general appropriations law read as follows:

> "Be it enacted . . . [t]hat there be appropriated for the service of the present year, to be paid out of the monies which arise, either from the requisitions heretofore made upon the several states, or from the duties on import and tonnage, the following sums, viz. A sum not exceeding two hundred and sixteen thousand dollars for defraying the expenses of the civil list, under the late and present government; a sum not exceeding one hundred and thirty-seven thousand dollars for defraying the expenses of the department of war; a sum not exceeding one hundred and ninety thousand dollars for discharging the warrants issued by the late board of treasury, and remaining unsatisfied; and a sum not exceeding ninety-six thousand dollars for paying the pensions to invalids."

Act of Sept. 29, 1789, ch. 23, § 1, 1 Stat. 95.

At that time, a Congress, wishing to give a President the power to select among appropriations, could simply have embodied each appropriation in a separate bill, each bill subject to a separate Presidential veto.

Today, however, our population is about 250 million, see U. S. Dept. of Commerce, Census Bureau, 1990 Census, the Federal Government employs more than 4 million people, see Office of Management and Budget, Budget of the United States Government, Fiscal Year 1998: Analytical Perspectives 207 (1997) (hereinafter Analytical Perspectives), the annual federal budget is $1.5 trillion, see Office of Management and Budget, Budget of the United States Government, Fiscal Year 1998: Budget 303 (1997) (hereinafter Budget), and a typical budget appropriations bill may have a dozen titles, hundreds of sections, and spread across more than 500 pages of the Statutes at Large. See, *e. g.*, Balanced Budget Act of 1997, Pub. L. 105–33, 111 Stat. 251. Congress cannot divide such a bill into thousands, or tens of thousands, of separate appropriations bills, each one of which the President would have to sign, or to veto, separately. Thus, the question is whether the Constitution permits Congress to choose a particular novel *means* to achieve this same, constitutionally legitimate, *end*.

*Second*, the case in part requires us to focus upon the Constitution's generally phrased structural provisions, provisions that delegate all "legislative" power to Congress and vest all "executive" power in the President. See Part IV, *infra*. The Court, when applying these provisions, has interpreted them generously in terms of the institutional arrangements that they permit. See, *e. g.*, *Mistretta* v. *United States*, 488 U. S. 361, 412 (1989) (upholding delegation of authority to Sentencing Commission to promulgate Sentencing Guidelines); *Crowell* v. *Benson*, 285 U. S. 22, 53–54 (1932) (permitting non-Article III commission to adjudicate factual

disputes arising under federal dock workers' compensation statute). See generally, *e. g., OPP Cotton Mills, Inc.* v. *Administrator of Wage and Hour Div., Dept. of Labor,* 312 U. S. 126, 145 (1941) ("In an increasingly complex society Congress obviously could not perform its functions" without delegating details of regulatory scheme to executive agency); *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579, 635 (1952) (Jackson, J., concurring) (Constitution permits "interdependence" and flexible relations between branches in order to secure "workable government"); *J. W. Hampton, Jr., & Co.* v. *United States,* 276 U. S. 394, 406 (1928) (Taft, C. J.) ("[T]he extent and character of . . . assistance [between the different branches] must be fixed according to common sense and the inherent necessities of the governmental coordination"); *Crowell* v. *Benson, supra,* at 53 ("[R]egard must be had" in cases "where constitutional limits are invoked, not to mere matters of form but to the substance of what is required").

Indeed, Chief Justice Marshall, in a well-known passage, explained,

> "To have prescribed the means by which government should, in all future time, execute its powers, would have been to change, entirely, the character of the instrument, and give it the properties of a legal code. It would have been an unwise attempt to provide, by immutable rules, for exigencies which, if foreseen at all, must have been seen dimly, and which can be best provided for as they occur." *McCulloch* v. *Maryland,* 4 Wheat. 316, 415 (1819).

This passage, like the cases I have just mentioned, calls attention to the genius of the Framers' pragmatic vision, which this Court has long recognized in cases that find constitutional room for necessary institutional innovation.

*Third,* we need not here referee a dispute among the other two branches. And, as the majority points out:

" 'When this Court is asked to invalidate a statutory provision that has been approved by both Houses of the Congress and signed by the President, particularly an Act of Congress that confronts a deeply vexing national problem, it should only do so for the most compelling constitutional reasons.'" *Ante,* at 447, n. 42 (quoting *Bowsher* v. *Synar,* 478 U. S. 714, 736 (1986) (STEVENS, J., concurring in judgment)).

Cf. *Youngstown Sheet and Tube Co., supra,* at 635 (Jackson, J., concurring) ("Presidential powers are not fixed but fluctuate, depending on their disjunction or conjunction with those of Congress . . . [and when] the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum").

These three background circumstances mean that, when one measures the *literal* words of the Act against the Constitution's *literal* commands, the fact that the Act may closely resemble a different, literally unconstitutional, arrangement is beside the point. To drive exactly 65 miles per hour on an interstate highway closely resembles an act that violates the speed limit. But it does not violate that limit, for small differences matter when the question is one of literal violation of law. No more does this Act literally violate the Constitution's words. See Part III, *infra.*

The background circumstances also mean that we are to interpret nonliteral separation-of-powers principles in light of the need for "workable government." *Youngstown Sheet and Tube Co., supra,* at 635 (Jackson, J., concurring). If we apply those principles in light of that objective, as this Court has applied them in the past, the Act is constitutional. See Part IV, *infra.*

## III

The Court believes that the Act violates the literal text of the Constitution. A simple syllogism captures its basic reasoning:

474

> Major Premise: The Constitution sets forth an exclusive method for enacting, repealing, or amending laws. See *ante*, at 438–440.
>
> Minor Premise: The Act authorizes the President to "repea[l] or amen[d]" laws in a different way, namely by announcing a cancellation of a portion of a previously enacted law. See *ante*, at 436–438.
>
> Conclusion: The Act is inconsistent with the Constitution. See *ante*, at 448–449.

I find this syllogism unconvincing, however, because its Minor Premise is faulty. When the President "canceled" the two appropriation measures now before us, he did not *repeal* any law nor did he *amend* any law. He simply *followed* the law, leaving the statutes, as they are literally written, intact.

To understand why one cannot say, *literally speaking*, that the President has repealed or amended any law, imagine how the provisions of law before us might have been, but were not, written. Imagine that the canceled New York health care tax provision at issue here, Pub. L. 105–33, § 4722(c), 111 Stat. 515 (quoted in full *ante*, at 422–423, n. 2), had instead said the following:

> "Section One. Taxes . . . that were collected by the State of New York from a health care provider before June 1, 1997, and for which a waiver of the provisions [requiring payment] have been sought . . . are deemed to be permissible health care related taxes . . . *provided however that the President may prevent the just-mentioned provision from having legal force or effect if he determines x, y, and z*" (Assume x, y, and z to be the same determinations required by the Line Item Veto Act).

Whatever a person might say, or think, about the constitutionality of this imaginary law, there is one thing the English language would prevent one from saying. One could not say that a President who "prevent[s]" the deeming language

from "having legal force or effect," see 2 U. S. C. § 691e(4)(B) (1994 ed., Supp. II), has either *repealed* or *amended* this particular hypothetical statute.   Rather, the President has *followed* that law to the letter.   He has exercised the power it explicitly delegates to him.   He has executed the law, not repealed it.

It could make no significant difference to this linguistic point were the italicized proviso to appear, not as part of what I have called Section One, but, instead, at the bottom of the statute page, say, referenced by an asterisk, with a statement that it applies to every spending provision in the Act next to which a similar asterisk appears.   And that being so, it could make no difference if that proviso appeared, instead, in a different, earlier enacted law, along with legal language that makes it applicable to every future spending provision picked out according to a specified formula.   See, *e. g.*, Balanced Budget and Emergency Deficit Control Act of 1985 (Gramm-Rudman-Hollings Act), Pub. L. 99–177, 99 Stat. 1063, 2 U. S. C. § 901 *et seq.* (enforcing strict spending and deficit-neutrality limits on future appropriations statutes); see also 1 U. S. C. § 1 (in *"any* Act of Congress" singular words include plural, and vice versa) (emphasis added).

But, of course, this last mentioned possibility is this very case.   The earlier law, namely, the Line Item Veto Act, says that "the President may . . . prevent such [future] budget authority from having legal force or effect."   2 U. S. C. §§ 691(a), 691e(4)(B) (1994 ed., Supp. II).   Its definitional sections make clear that it applies to the 1997 New York health care provision, see § 691e(8), just as they give a special legal meaning to the word "cancel," § 691e(4).   For that reason, one cannot dispose of this case through a purely literal analysis as the majority does.   Literally speaking, the President has not "repealed" or "amended" anything.   He has simply *executed* a power conferred upon him by Congress, which power is contained in laws that were enacted in compliance with the exclusive method set forth in the Constitution. See *Field* v. *Clark,* 143 U. S. 649, 693 (1892) (President's

power to raise tariff rates *"was a part of the law itself, as it left the hands of Congress"* (emphasis added)).

Nor can one dismiss this literal compliance as some kind of formal quibble, as if it were somehow "obvious" that what the President has done "amounts to," "comes close to," or is "analogous to" the repeal or amendment of a previously enacted law. That is because the power the Act grants the President (to render designated appropriations items without "legal force or effect") also "amounts to," "comes close to," or is "analogous to" a different legal animal, the delegation of a power to choose one legal path as opposed to another, such as a power to appoint.

To take a simple example, a legal document, say, a will or a trust instrument, might grant a beneficiary the power (a) to appoint property "to Jones for his life, remainder to Smith for 10 years so long as Smith . . . etc., and then to Brown," or (b) to appoint the same property "to Black and the heirs of his body," or (c) not to exercise the power of appointment at all. See, *e. g.,* 5 W. Bowe & D. Parker, Page on Law of Wills §45.8 (rev. 3d ed. 1962) (describing power of appointment). To choose the second or third of these alternatives prevents from taking effect the legal consequences that flow from the first alternative, which the legal instrument describes in detail. Any such choice, made in the exercise of a delegated power, renders that first alternative language without "legal force or effect." But such a choice does not "repeal" or "amend" either that language or the document itself. The will or trust instrument, in delegating the power of appointment, has not delegated a power to amend or to repeal the instrument; to the contrary, it requires the delegated power to be exercised in accordance with the instrument's terms. *Id.,* §45.9, pp. 516–518.

The trust example is useful not merely because of its simplicity, but also because it illustrates the logic that must apply when a power to execute is conferred, not by a private trust document, but by a federal statute. This is not the

first time that Congress has delegated to the President or to others this kind of power—a contingent power to deny effect to certain statutory language. See, *e. g.*, Pub. L. 95–384, § 13(a), 92 Stat. 737 ("Section 620(x) of the Foreign Assistance Act of 1961 *shall be of no further force and effect* upon the President's determination and certification to the Congress that the resumption of full military cooperation with Turkey is in the national interest of the United States and [other criteria]") (emphasis added); 28 U. S. C. § 2072 (Supreme Court is authorized to promulgate rules of practice and procedure in federal courts, and "[a]ll laws in conflict with such rules *shall be of no further force and effect*") (emphasis added); 41 U. S. C. § 405b (subsection (a) requires the Office of Federal Procurement Policy to issue "[g]overnment-wide regulations" setting forth a variety of conflict of interest standards, but subsection (e) says that "if the President determine[s]" that the regulations "would have a significantly adverse effect on the accomplishment of the mission" of Government agencies, "the requirement [to promulgate] the regulations . . . *shall be null and void*") (emphasis added); Gramm-Rudman-Hollings Act, § 252(a)(4), 99 Stat. 1074 (authorizing the President to issue a "final order" that has the effect of *"permanently cancell[ing]"* sequestered amounts in spending statutes in order to achieve budget compliance) (emphasis added); Pub. L. 104–208, 110 Stat. 3009-695 ("Public Law 89–732 [dealing with immigration from Cuba] *is repealed* . . . upon a determination by the President . . . that a democratically elected government in Cuba is in power") (emphasis added); Pub. L. 99–498, § 701, 100 Stat. 1532 (amending § 758 of the Higher Education Act of 1965) (Secretary of Education "may" sell common stock in an educational loan corporation; if the Secretary decides to sell stock, and "if the Student Loan Marketing Association acquires from the Secretary" over 50 percent of the voting stock, "section 754 [governing composition of the Board of Directors] *shall be of no further force or effect*") (emphasis

added); Pub. L. 104–134, §2901(c), 110 Stat. 1321–160 (President is "authorized to suspend the provisions of the [preceding] proviso" which suspension may last for *entire* effective period of proviso, if he determines suspension is "appropriate based upon the public interest in sound environmental management . . . [or] the protection of national or locally-affected interests, or protection of any cultural, biological or historic resources").

All of these examples, like the Act, delegate a power to take action that will render statutory provisions "without force or effect." Every one of these examples, like the present Act, delegates the power to choose between alternatives, each of which the statute spells out in some detail. None of these examples delegates a power to "repeal" or "amend" a statute, or to "make" a new law. Nor does the Act. Rather, the delegated power to nullify statutory language was *itself* created and defined by Congress, and included in the statute books on an equal footing with (indeed, as a component part of) the sections that are potentially subject to nullification. As a Pennsylvania court put the matter more than a century ago: "The legislature cannot delegate its power to make a law; but it can make a law to delegate a power." *Locke's Appeal*, 72 Pa. 491, 498 (1873).

In fact, a power to appoint property offers a closer analogy to the power delegated here than one might at first suspect. That is because the Act contains a "lockbox" feature, which gives legal significance to the enactment of a particular appropriations item even if, and even after, the President has rendered it without "force or effect." See 2 U. S. C. §691c (1994 ed., Supp. II); see also *ante*, at 440–441, n. 31 (describing "lockbox"); but cf. Letter from Counsel for Snake River Cooperative, dated Apr. 29, 1998 (available in Clerk of Court's case file) (arguing "lockbox" feature inapplicable here due to special provision in Balanced Budget Act of 1997, the constitutionality and severability of which have not been argued). In essence, the "lockbox" feature: (1) points to a

Gramm-Rudman-Hollings Act requirement that, when Congress enacts a "budget busting" appropriation bill, automatically reduces authorized spending for a host of federal programs in a pro rata way; (2) notes that cancellation of an item (say, a $2 billion item) would, absent the "lockbox" provision, neutralize (by up to $2 billion) the potential "budget busting" effects of other bills (and therefore potentially the President could cancel items in order to "save" the other programs from the mandatory cuts, resulting in no net deficit reduction); and (3) says that this "neutralization" will not occur (*i. e.*, the pro rata reductions will take place just as if the $2 billion item had not been canceled), so that the canceled items truly provide *additional* budget savings over and above the Gramm-Rudman-Hollings regime. See generally H. R. Conf. Rep. No. 104–491, pp. 23–24 (1996) ("lockbox" provision included "to ensure that the savings from the cancellation of [items] are devoted to deficit reduction and are not available to offset a deficit increase in another law"). That is why the Government says that the Act provides a "lockbox," and why it seems fair to say that, despite the Act's use of the word "cancel," the Act does not delegate to the President the power truly to *cancel* a line item expenditure (returning the legal status quo to one in which the item had never been enacted). Rather, it delegates to the President the power to decide *how* to spend the money to which the line item refers—either for the specific purpose mentioned in the item, or for general deficit reduction via the "lockbox" feature.

These features of the law do not mean that the delegated power is, or is just like, a power to appoint property. But they do mean that it is not, and it is not just like, the repeal or amendment of a law, or, for that matter, a true line item veto (despite the Act's title). Because one cannot say that the President's exercise of the power the Act grants is, literally speaking, a "repeal" or "amendment," the fact that the Act's procedures differ from the Constitution's exclusive pro-

cedures for enacting (or repealing) legislation is beside the point. The Act *itself* was enacted in accordance with these procedures, and its failure to require the President to satisfy those procedures does not make the Act unconstitutional.

## IV

Because I disagree with the Court's holding of literal violation, I must consider whether the Act nonetheless violates separation-of-powers principles—principles that arise out of the Constitution's vesting of the "executive Power" in "a President," U. S. Const., Art. II, § 1, and "[a]ll legislative Powers" in "a Congress," Art. I, § 1. There are three relevant separation-of-powers questions here: (1) Has Congress given the President the wrong kind of power, *i. e.,* "non-Executive" power? (2) Has Congress given the President the power to "encroach" upon Congress' own constitutionally reserved territory? (3) Has Congress given the President too much power, violating the doctrine of "nondelegation?" These three limitations help assure "adequate control by the citizen's Representatives in Congress," upon which JUSTICE KENNEDY properly insists. See *ante,* at 451 (concurring opinion). And with respect to *this* Act, the answer to all these questions is "no."

## A

Viewed conceptually, the power the Act conveys is the right kind of power. It is "executive." As explained above, an exercise of that power "executes" the Act. Conceptually speaking, it closely resembles the kind of delegated authority—to spend or not to spend appropriations, to change or not to change tariff rates—that Congress has frequently granted the President, any differences being differences in degree, not kind. See Part IV–C, *infra.*

The fact that one could also characterize this kind of power as "legislative," say, if Congress itself (by amending the appropriations bill) prevented a provision from taking effect, is beside the point. This Court has frequently found that the

exercise of a particular power, such as the power to make rules of broad applicability, *American Trucking Assns., Inc.* v. *United States,* 344 U. S. 298, 310–313 (1953), or to adjudicate claims, *Crowell* v. *Benson,* 285 U. S., at 50–51, 54; *Wiener* v. *United States,* 357 U. S. 349, 354–356 (1958), can fall within the constitutional purview of more than one branch. of Government. See *Wayman* v. *Southard,* 10 Wheat. 1, 43 (1825) (Marshall, C. J.) ("Congress may certainly delegate to others, powers which the legislature may rightfully exercise itself"). The Court does not "carry out the distinction between legislative and executive action with mathematical precision" or "divide the branches into watertight compartments," *Springer* v. *Philippine Islands,* 277 U. S. 189, 211 (1928) (Holmes, J., dissenting), for, as others have said, the Constitution "blend[s]" as well as "separat[es]" powers in order to create a workable government. 1 K. Davis, Administrative Law § 1.09, p. 68 (1958).

The Court has upheld congressional delegation of rule-making power and adjudicatory power to federal agencies, *American Trucking Assns.* v. *United States, supra,* at 310–313; *Wiener* v. *United States, supra,* at 354–356, guideline-writing power to a Sentencing Commission, *Mistretta* v. *United States,* 488 U. S., at 412, and prosecutor-appointment power to judges, *Morrison* v. *Olson,* 487 U. S. 654, 696–697 (1988). It is far easier *conceptually* to reconcile the power at issue here with the relevant constitutional description ("executive") than in many of these cases. And cases in which the Court may have found a delegated power and the basic constitutional function of another branch conceptually irreconcilable are yet more distant. See, *e. g., Federal Radio Comm'n* v. *General Elec. Co.,* 281 U. S. 464 (1930) (power to award radio licenses not a "judicial" power).

If there is a separation-of-powers violation, then, it must rest, not upon purely conceptual grounds, but upon some important conflict between the Act and a significant separation-of-powers objective.

## B

The Act does not undermine what this Court has often described as the principal function of the separation of powers, which is to maintain the tripartite structure of the Federal Government—and thereby protect individual liberty—by providing a "safeguard against the encroachment or aggrandizement of one branch at the expense of the other." *Buckley* v. *Valeo,* 424 U. S. 1, 122 (1976) *(per curiam); Mistretta* v. *United States, supra,* at 380–382. See The Federalist No. 51, p. 349 (J. Cooke ed. 1961) (J. Madison) (separation of powers confers on each branch the means "to resist encroachments of the others"); 1 Davis, *supra,* § 1.09, at 68 ("The danger is not blended power[;] [t]he danger is unchecked power"); see also, *e. g., Bowsher* v. *Synar,* 478 U. S. 714 (1986) (invalidating congressional intrusion on Executive Branch); *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.,* 458 U. S. 50 (1982) (Congress may not give away Article III "judicial" power to an Article I judge); *Myers* v. *United States,* 272 U. S. 52 (1926) (Congress cannot limit President's power to remove Executive Branch official).

In contrast to these cases, one cannot say that the Act "encroaches" upon Congress' power, when Congress retained the power to insert, by simple majority, into any future appropriations bill, into any section of any such bill, or into any phrase of any section, a provision that says the Act will not apply. See 2 U. S. C. § 691f(c)(1) (1994 ed., Supp. II); *Raines* v. *Byrd,* 521 U. S. 811, 824 (1997) (Congress can "exempt a given appropriations bill (or a given provision in an appropriations bill) from the Act"). Congress also retained the power to "disapprov[e]," and thereby reinstate, any of the President's cancellations. See 2 U. S. C. § 691b(a). And it is Congress that drafts and enacts the appropriations statutes that are subject to the Act in the first place—and thereby defines the outer limits of the President's cancellation authority. Thus *this* Act is not the sort of delegation "without . . . sufficient check" that concerns JUSTICE KEN-

NEDY. See *ante,* at 450 (concurring opinion). Indeed, the President acts only in response to, and on the terms set by, the Congress.

Nor can one say that the Act's basic substantive objective is constitutionally improper, for the earliest Congresses could, see Part II, *supra,* and often did, confer on the President this sort of discretionary authority over spending, see *ante,* at 466–467 (SCALIA, J., concurring in part and dissenting in part). Cf. *J. W. Hampton,* 276 U. S., at 412 (Taft, C. J.) ("[C]ontemporaneous legislative exposition of the Constitution when the founders of our Government and the framers of our Constitution were actively participating in public affairs . . . fixes the construction to be given to its provisions"). And, if an individual Member of Congress, who, say, favors aid to Country A but not to Country B, objects to the Act on the ground that the President may "rewrite" an appropriations law to do the opposite, one can respond: "But a majority of Congress voted that he have that power; you may vote to exempt the relevant appropriations provision from the Act; and if you command a majority, your appropriation is safe." Where the burden of overcoming legislative inertia lies is within the power of Congress to determine by rule. Where is the encroachment?

Nor can one say the Act's grant of power "aggrandizes" the Presidential office. The grant is limited to the context of the budget. It is limited to the power to spend, or not to spend, particular appropriated items, and the power to permit, or not to permit, specific limited exemptions from generally applicable tax law from taking effect. These powers, as I will explain in detail, resemble those the President has exercised in the past on other occasions. See Part IV–C, *infra.* The delegation of those powers to the President may strengthen the Presidency, but any such change in Executive Branch authority seems minute when compared with the changes worked by delegations of other kinds of authority that the Court in the past has upheld. See, *e. g., American*

*Trucking Assns., Inc.* v. *United States,* 344 U. S. 298 (1953) (delegation of rulemaking authority); *Lichter* v. *United States,* 334 U. S. 742 (1948) (delegation to determine and regulate "excessive" profits); *Crowell* v. *Benson,* 285 U. S. 22 (1932) (delegation of adjudicatory authority); *Commodity Futures Trading Comm'n* v. *Schor,* 478 U. S. 833 (1986) (same).

## C

The "nondelegation" doctrine represents an added constitutional check upon Congress' authority to delegate power to the Executive Branch. And it raises a more serious constitutional obstacle here. The Constitution permits Congress to "see[k] assistance from another branch" of Government, the "extent and character" of that assistance to be fixed "according to common sense and the inherent necessities of the governmental co-ordination." *J. W. Hampton, supra,* at 406. But there are limits on the way in which Congress can obtain such assistance; it "cannot delegate any part of its legislative power except under the limitation of a prescribed standard." *United States* v. *Chicago, M., St. P. & P. R. Co.,* 282 U. S. 311, 324 (1931). Or, in Chief Justice Taft's more familiar words, the Constitution permits only those delegations where Congress "shall lay down by legislative act an *intelligible principle* to which the person or body authorized to [act] is directed to conform." *J. W. Hampton, supra,* at 409 (emphasis added).

The Act before us seeks to create such a principle in three ways. The first is procedural. The Act tells the President that, in "identifying dollar amounts [or] . . . items. . . for cancellation" (which I take to refer to his selection of the amounts or items he will "prevent from having legal force or effect"), he is to "consider," among other things,

> "the legislative history, construction, and purposes of the law which contains [those amounts or items, and] . . . any specific sources of information referenced in

such law or . . . the best available information . . . ."
2 U. S. C. § 691(b) (1994 ed., Supp. II).

The second is purposive. The clear purpose behind the Act, confirmed by its legislative history, is to promote "greater fiscal accountability" and to "eliminate wasteful federal spending and . . . special tax breaks." H. R. Conf. Rep. No. 104–491, p. 15 (1996).

The third is substantive. The President must determine that, to "prevent" the item or amount "from having legal force or effect" will "reduce the Federal budget deficit; . . . not impair any essential Government functions; and . . . not harm the national interest." 2 U. S. C. § 691(a)(A) (1994 ed., Supp. II).

The resulting standards are broad. But this Court has upheld standards that are equally broad, or broader. See, e. g., National Broadcasting Co. v. United States, 319 U. S. 190, 225–226 (1943) (upholding delegation to Federal Communications Commission to regulate broadcast licensing as "public interest, convenience, or necessity" require) (internal quotation marks omitted); FPC v. Hope Natural Gas Co., 320 U. S. 591, 600–603 (1944) (upholding delegation to Federal Power Commission to determine "just and reasonable" rates); United States v. Rock Royal Co-operative, Inc., 307 U. S. 533, 577 (1939) (if milk prices were "unreasonable," Secretary of Agriculture could "fi[x]" prices to a level that was "in the public interest"). See also Lichter v. United States, 334 U. S. 742, 785–786 (1948) (delegation of authority to determine "excessive" profits); American Power & Light Co. v. SEC, 329 U. S. 90, 104–105 (1946) (delegation of authority to Securities and Exchange Commission to prevent "unfairly or inequitably" distributing voting power among security holders); Yakus v. United States, 321 U. S. 414, 427 (1944) (upholding delegation to Price Administrator to fix commodity prices that would be "fair" and "equitable").

Indeed, the Court has only twice in its history found that a congressional delegation of power violated the "nondele-

gation" doctrine. One such case, *Panama Refining Co.* v. *Ryan*, 293 U. S. 388 (1935), was in a sense a special case, for it was discovered in the midst of the case that the particular exercise of the power at issue, the promulgation of a Petroleum Code under the National Industrial Recovery Act, did not contain any legally operative sentence. *Id.*, at 412–413. The other case, *A. L. A. Schechter Poultry Corp.* v. *United States*, 295 U. S. 495 (1935), involved a delegation through the National Industrial Recovery Act, 48 Stat. 195, that contained not simply a broad standard ("fair competition"), but also the conferral of power on private parties to promulgate rules applying that standard to virtually all of American industry, *id.*, at 521–525. As Justice Cardozo put it, the legislation exemplified "delegation running riot," which created a "roving commission to inquire into evils and upon discovery correct them." *Id.*, at 553, 551 (concurring opinion).

The case before us does not involve any such "roving commission," nor does it involve delegation to private parties, nor does it bring all of American industry within its scope. It is limited to one area of Government, the budget, and it seeks to give the President the power, in one portion of that budget, to tailor spending and special tax relief to what he concludes are the demands of fiscal responsibility. Nor is the standard that governs his judgment, though broad, any broader than the standard that currently governs the award of television licenses, namely, "public convenience, interest, *or* necessity." 47 U. S. C. § 303 (emphasis added). To the contrary, (a) the broadly phrased limitations in the Act, together with (b) its evident deficit reduction purpose, and (c) a procedure that guarantees Presidential awareness of the reasons for including a particular provision in a budget bill, taken together, guide the President's exercise of his discretionary powers.

1

The relevant similarities and differences among and between this case and other "nondelegation" cases can be listed

more systematically as follows: First, as I have just said, like statutes delegating power to award broadcast television licenses, or to regulate the securities industry, or to develop and enforce workplace safety rules, the Act is aimed at a discrete problem: namely, a particular set of expenditures within the federal budget. The Act concerns, not the entire economy, cf. *Schecter Poultry Corp., supra,* but the annual federal budget. Within the budget it applies only to *discretionary* budget authority and *new* direct spending items, that together amount to approximately a third of the current annual budget outlays, see Tr. of Oral Arg. 18; see also Budget 303, and to "limited tax benefits" that (because each can affect no more than 100 people, see 2 U. S. C. § 691e(9)(A) (1994 ed., Supp. II)), amount to a tiny fraction of federal revenues and appropriations. Compare Analytical Perspectives 73–75 (listing over *$500 billion* in overall "tax expenditures" that OMB estimated were contained in federal law in 1997) and Budget 303 (federal outlays and receipts in 1997 were both over *$1.5 trillion*) with App. to Juris. Statement 71a (President's cancellation message for Snake River appellees' limited tax benefit, estimating annual "value" of benefit, in terms of revenue loss, at about *$20 million*).

Second, like the award of television licenses, the particular problem involved—determining whether or not a particular amount of money should be spent or whether a particular dispensation from tax law should be granted a few individuals—does not readily lend itself to a significantly more specific standard. The Act makes clear that the President should consider the reasons for the expenditure, measure those reasons against the desirability of avoiding a deficit (or building a surplus), and make up his mind about the comparative weight of these conflicting goals. Congress might have expressed this matter in other language, but could it have done so in a *significantly* more specific way? See *National Broadcasting Co.* v. *United States, supra,* at 216 ("[P]ublic interest, convenience, or necessity" standard is

" 'as concrete as the complicated factors for judgment in such a field of delegated authority permit' ") (quoting *FCC* v. *Pottsville Broadcasting Co.*, 309 U. S. 134, 138 (1940)). The statute's language, I believe, is sufficient to provide the President, and the public, with a fairly clear idea as to what Congress had in mind. And the public can judge the merits of the President's choices accordingly. Cf. *Yakus* v. *United States*, 321 U. S., at 426 (standards were "sufficiently definite and precise to enable . . . the public to ascertain . . . conform[ity]").

Third, insofar as monetary expenditure (but not "tax expenditure") is at issue, the President acts in an area where history helps to justify the discretionary power that Congress has delegated, and where history may inform his exercise of the Act's delegated authority. Congress has frequently delegated the President the authority to spend, or not to spend, particular sums of money. See, *e. g.*, Act of Sept. 29, 1789, ch. 23, 1 Stat. 95; Act of Mar. 26, 1790, ch. 4, § 1, 1 Stat. 104; Act of Feb. 11, 1791, ch. 6, 1 Stat. 190; Emergency Relief Appropriation Act of 1935, 49 Stat. 115 (appropriating over $4 billion to be spent "in the discretion and under the direction of the President" for economic relief measures); see also *ante*, at 466–467 (SCALIA, J., concurring in part and dissenting in part) (listing numerous examples).

Fourth, the Constitution permits Congress to rely upon context and history as providing the necessary standard for the exercise of the delegated power. See, *e. g.*, *Federal Radio Comm'n* v. *Nelson Brothers Bond & Mortgage Co. (Station WIBO)*, 289 U. S. 266, 285 (1933) ("public interest, convenience, or necessity [standard] . . . is to be interpreted by its context"); *Fahey* v. *Mallonee*, 332 U. S. 245, 253 (1947) (otherwise vague delegation to regulate banks was "sufficiently explicit, against the background of custom, to be adequate"). Relying upon context, Congress has sometimes granted the President broad discretionary authority over

spending in laws that mention no standard at all.    See, *e. g.,* Act of Mar. 3, 1809, ch. 28, § 1, 2 Stat. 535–536 (granting the President recess authority to transfer money "appropriated for a particular branch of expenditure in [a] department" to be "applied [instead] to another branch of expenditure in the same department"); Revenue and Expenditure Control Act of 1968, §§ 202(b), 203(b), 82 Stat. 271–272; (authorizing the President annually to reserve up to $6 billion in outlays and $10 billion in new obligation authority); Second Supplemental Appropriations Act, 1969, § 401, 83 Stat. 82; Second Supplemental Appropriations Act, 1970, §§ 401, 501, 84 Stat. 405–407.    In this case, too, context and purpose can give meaning to highly general language.    See *Federal Radio Comm'n* v. *Nelson Bros., supra,* at 285; *Fahey* v. *Malonee, supra,* at 250–253; cf. *Lichter* v. *United States,* 334 U. S., at 777 (Congress has "at least expressed . . . satisfaction with the existing specificity of the Act"); *Train* v. *City of New York,* 420 U. S. 35, 44–47 (1975) (disallowing President Nixon's efforts to impound funds because Court found Congress did not *intend* him to exercise the power in that instance).

On the other hand, I must recognize that there are important differences between the delegation before us and other broad, constitutionally acceptable delegations to Executive Branch agencies—differences that argue against my conclusion.    In particular, a broad delegation of authority to an administrative agency differs from the delegation at issue here in that agencies often develop subsidiary rules under the statute, rules that explain the general "public interest" language.    Doing so diminishes the risk that the agency will use the breadth of a grant of authority as a cloak for unreasonable or unfair implementation.    See 1 K. Davis, Administrative Law § 3:15, pp. 207–208 (2d ed. 1978).    Moreover, agencies are typically subject to judicial review, which review provides an additional check against arbitrary implementation.    See, *e. g., Motor Vehicle Mfrs. Assn. of United*

*States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463
U. S. 29, 40–42 (1983). The President has not so narrowed
his discretionary power through rule, nor is his implemen-
tation subject to judicial review under the terms of the Ad-
ministrative Procedure Act. See, *e. g.*, *Franklin* v. *Massa-
chusetts*, 505 U. S. 788, 801 (1992) (APA does not apply to
President absent express statement by Congress).

While I believe that these last mentioned considerations
are important, they are not determinative. The President,
unlike most agency decisionmakers, is an elected official.
He is responsible to the voters, who, in principle, will judge
the manner in which he exercises his delegated authority.
Whether the President's expenditure decisions, for example,
are arbitrary is a matter that in the past has been left pri-
marily to those voters to consider. And this Court has made
clear that judicial review is less appropriate when the Presi-
dent's own discretion, rather than that of an agency, is at
stake. See *Dalton* v. *Specter*, 511 U. S. 462, 476 (1994) (Pres-
idential decision on military base closure recommendations
not reviewable; President could "approv[e] or disapprov[e]
the recommendations for whatever reason he sees fit");
*Franklin*, 505 U. S., at 801 (President's decision whether or
not to transmit census report to Congress was unreviewable
by courts for abuse of discretion); cf. *id.*, at 799–800 (it was
"important to the integrity of the process" that the decision
was made by the President, a "constitutional officer" as op-
posed to the unelected Secretary of Commerce). These
matters reflect in part the Constitution's own delegation of
"executive Power" to "a President," Art. II, § 1; cf. *Clinton*
v. *Jones*, 520 U. S. 681, 710–711 (1997) (BREYER, J., concur-
ring in judgment) (discussing unitary Executive), and we
must take this into account when applying the Constitution's
nondelegation doctrine to questions of Presidential authority.

Consequently I believe that the power the Act grants the
President to prevent spending items from taking effect does
not violate the "nondelegation" doctrine.

2

Most, but not all, of the considerations mentioned in the previous subsection apply to the Act's delegation to the President of the authority to prevent "from having legal force or effect" a "limited tax benefit," which term the Act defines in terms of special tax relief for fewer than 100 (or in some instances 10) beneficiaries, which tax relief is not available to others who are somewhat similarly situated. 2 U. S. C. § 691e(9) (1994 ed., Supp. II). There are, however, two related significant differences between the "limited tax benefit" and the spending items considered above, which make the "limited tax benefit" question more difficult. First, the history is different. The history of Presidential authority to pick and to choose is less voluminous. Second, the subject matter (increasing or decreasing an individual's taxes) makes the considerations discussed at the end of the last section (*i. e.*, the danger of an arbitrary exercise of delegated power) of greater concern. But these differences, in my view, are not sufficient to change the "nondelegation" result.

For one thing, this Court has made clear that the standard we must use to judge whether a law violates the "nondelegation" doctrine is the same in the tax area as in any other. In *Skinner* v. *Mid-America Pipeline Co.*, 490 U. S. 212 (1989), the Court considered whether Congress, in the exercise of its taxing power, could delegate to the Secretary of Transportation the authority to establish a system of pipeline user fees. In rejecting the argument that the "fees" were actually a "tax," and that the law amounted to an unconstitutional delegation of Congress' own power to tax, the unanimous Court said that:

> "From its earliest days to the present, Congress, when enacting tax legislation, has varied the degree of specificity and the consequent degree of discretionary authority delegated to the Executive . . . .

.        .        .        .        .

"We find no support . . . for [the] contention that the text of the Constitution or the practices of Congress require the application of a different and stricter nondelegation doctrine in cases where Congress delegates discretionary authority to the Executive under its taxing power. . . . Even if the user fees are a form of taxation, we hold that the delegation of discretionary authority under Congress' taxing power is subject to no constitutional scrutiny greater than that we have applied to other nondelegation challenges. Congress may wisely choose to be more circumspect in delegating authority under the Taxing Clause than under other of its enumerated powers, but this is not a heightened degree of prudence required by the Constitution." *Id.*, at 221–223.

For another thing, this Court has upheld tax statutes that delegate to the President the power to change taxes under very broad standards. In 1890, for example, Congress authorized the President to "suspend" the provisions of the tariff statute, thereby raising tariff rates, if the President determined that other nations were imposing "reciprocally unequal and unreasonable" tariff rates on specialized commodities. Act of Oct. 1, 1890, ch. 1244, § 3, 26 Stat. 612. And the Court upheld the statute against constitutional attack. *Field* v. *Clark*, 143 U. S., at 693–694 ("[N]o valid objection can be made" to such statutes "conferring authority or discretion" on the President) (internal quotation marks omitted); see also Act of Dec. 19, 1806, ch. 1, 2 Stat. 411 (President "authorized" to "suspend the operation of" a customs law "if in his judgment the public interest should require it"); Act of June 4, 1794, ch. 41, § 1, 1 Stat. 372 (empowering President to lay an embargo on ships in ports "whenever, in his opinion, the public safety shall so require" and to revoke related regulations "whenever he shall think proper"). In 1922 Congress gave the President the authority to adjust tariff rates to "equalize" the differences in costs of production at home and abroad, see Tariff Act of 1922, ch. 356,

§ 315(a), 42 Stat. 941–942. The Court also upheld this delegation against constitutional attack. See *J. W. Hampton, Jr., & Co.* v. *United States*, 276 U. S. 394 (1928).

These statutory delegations resemble today's Act more closely than one might at first suspect. They involve a duty on imports, which is a tax. That tax in the last century was as important then as the income tax is now, for it provided most of the Federal Government's revenues. See U. S. Dept. of Commerce, Census Bureau, Historical Statistics of the United States: Colonial Times to 1970, pt. 2, at 1106 (in 1890, when Congress passed the statute at issue in *Field*, tariff revenues were 57% of the total receipts of the Federal Government). And the delegation then thus affected a far higher percentage of federal revenues than the tax-related delegation over extremely "limited" tax benefits here. See *supra*, at 487.

The standards at issue in these earlier laws, such as "unreasonable," were frequently vague and without precise meaning. See, *e. g.*, Act of Oct. 1, 1890, § 3, 26 Stat. 612. Indeed, the word "equalize" in the 1922 statute, 42 Stat. 942, could not have been administered as if it offered the precision it seems to promise, for a tariff that literally "equalized" domestic and foreign production costs would, because of transport costs, have virtually ended foreign trade.

Nor can I accept the majority's effort to distinguish these examples. The majority says that these statutes imposed a specific "duty" upon the President to act upon the occurrence of a specified event. See *ante*, at 443. But, in fact, some of the statutes imposed no duty upon the President at all. See, *e. g.*, Act of Dec. 19, 1806, ch. 1, 2 Stat. 411 (President "authorized" to "suspend the operation of" a customs law "if in his judgment the public interest should require it"). Others imposed a "duty" in terms so vague as to leave substantial discretion in the President's hands. See Act of Oct. 1, 1890, 26 Stat. 612 (President's "duty" to suspend tariff law was triggered "whenever" and "so often as" he was "satisfied"

that "unequal and unreasonable" rates were imposed); see also *Field* v. *Clark*, *supra*, at 691 (historically in the flexible tariff statutes Congress has "invest[ed] the President with large discretion").

The majority also tries to distinguish these examples on the ground that the President there executed congressional policy while here he rejects that policy. See *ante*, at 444. The President here, however, in exercising his delegated authority does not *reject* congressional policy. Rather, he *executes* a law in which Congress has specified its desire that the President have the very authority he has exercised. See Part III, *supra*.

The majority further points out that these cases concern imports, an area that, it says, implicates foreign policy and therefore justifies an unusual degree of discretion by the President. See *ante*, at 445. Congress, however, has not limited its delegations of taxation authority to the "foreign policy" arena. The first Congress gave the Secretary of the Treasury the "power to mitigate or remit" statutory penalties for nonpayment of liquor taxes "upon such terms and conditions as shall appear to him reasonable." Act of Mar. 3, 1791, ch. 15, § 43, 1 Stat. 209. A few years later, the Secretary was authorized, in lieu of collecting the stamp duty enacted by Congress, "to agree to an annual composition for the amount of such stamp duty, with any of the said banks, of one per centum on the amount of the annual dividend made by such banks." Act of July 6, 1797, ch. 11, § 2, 1 Stat. 528. More recently, Congress has given to the Executive Branch the authority to "prescribe all needful rules and regulations for the enforcement of [the Internal Revenue Code], including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue." 26 U. S. C. § 7805(a). And the Court has held that such rules and regulations, "which undoubtedly affect individual taxpayer liability, are . . . without doubt the result of entirely appropriate delegations of discretionary authority

by Congress." *Skinner* v. *Mid-America Pipeline Co.,* 490 U. S., at 222. I do not believe the Court would hold the same delegations at issue in *J. W. Hampton* and *Field* unconstitutional were they to arise in a more obviously domestic area.

Finally, the tax-related delegation is limited in ways that tend to diminish any widespread risk of arbitrary Presidential decisionmaking:

(1) The Act does not give the President authority to change general tax policy. That is because the limited tax benefits are defined in terms of deviations from tax policy, *i. e.,* special benefits to fewer than 100 individuals. See 2 U. S. C. § 691e(9)(A)(i) (1994 ed., Supp. II); see also Analytical Perpectives 84 (defining "tax expenditure" as "a preferential exception to the baseline provisions of the tax structure").

(2) The Act requires the President to make the same kind of policy judgment with respect to these special benefits as with respect to items of spending. He is to consider the budget as a whole, he is to consider the particular history of the tax benefit provision, and he is to consider whether the provision is worth the loss of revenue it causes in the same way that he must decide whether a particular expenditure item is worth the added revenue that it requires. See *supra,* at 484–485.

(3) The delegated authority does not destroy any individual's expectation of receiving a particular benefit, for the Act is written to say to the small group of taxpayers who may receive the benefit, "Taxpayers, you will receive an exemption from ordinary tax laws, but only if the President decides the budgetary loss is not too great."

(4) The "limited tax benefit" provisions involve only a small part of the federal budget, probably less than one percent of total annual outlays and revenues. Compare Budget 303 (federal outlays and receipts in 1997 were both over *$1.5 trillion*) with App. to Juris. Statement 71a (President's cancellation message for Snake River appellees' limited tax ben-

efit, estimating annual "value" of benefit, in terms of revenue loss, at about *$20 million*) and Taxpayer Relief Act of 1997, § 1701, 111 Stat. 1099 (identifying only 79 "limited tax benefits" subject to cancellation in the entire tax statute).

(5) Because the "tax benefit" provisions are part and parcel of the budget provisions, and because the Act in defining them, focuses upon "revenue-losing" tax provisions, 2 U. S. C. § 691e(9)(A)(i) (1994 ed., Supp. II), it regards "tax benefits" as if they were a special kind of *spending,* namely spending that puts back into the pockets of a small group of taxpayers, money that "baseline" tax policy would otherwise take from them. There is, therefore, no need to consider this provision as if it represented a delegation of authority to the President, outside the budget expenditure context, to set major policy under the federal tax laws. But cf. *Skinner* v. *Mid-America Pipeline, supra,* at 222–223 (no "different and stricter" nondelegation doctrine in the taxation context). Still less does approval of the delegation in this case, given the long history of Presidential discretion in the budgetary context, automatically justify the delegation to the President of the authority to alter the effect of other laws outside that context.

The upshot is that, in my view, the "limited tax benefit" provisions do not differ enough from the "spending" provisions to warrant a different "nondelegation" result.

## V

In sum, I recognize that the Act before us is novel. In a sense, it skirts a constitutional edge. But that edge has to do with means, not ends. The means chosen do not amount literally to the enactment, repeal, or amendment of a law. Nor, for that matter, do they amount literally to the "line item veto" that the Act's title announces. Those means do not violate any basic separation-of-powers principle. They do not improperly shift the constitutionally foreseen balance of power from Congress to the President. Nor, since

they comply with separation-of-powers principles, do they threaten the liberties of individual citizens. They represent an experiment that may, or may not, help representative government work better. The Constitution, in my view, authorizes Congress and the President to try novel methods in this way. Consequently, with respect, I dissent.